Jeffrey W. Herrmann
COHN LIFLAND PEARLMAN &
KNOPF LLP
Park 80 West-Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook,  New Jersey
Telephone: (201) 845-9600
Facsimile: (201) 845-9423

*Liaison Counsel for the Class*

Kim E. Miller
KAHN SWICK & FOTI, LLC
500 Fifth Avenue, Ste. 1810
New York, New York 10110
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

Lead Counsel for Lead Plaintiff and the
Class

## UNITED STATES DISTRICT COURT
## DISTRICT    OF NEW JERSEY

| | |
|---|---|
| SHAH RAHMAN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> KID BRANDS, INC., *et al.* <br> Defendants. | NO. 2:1 1-CV-1624-JLL-CCC <br><br> **LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AMENDED COMPLAINT** |

# **TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT……………………………….……...1

II.  FACTUAL BACKGROUND…………………………………..……..6

III. ARGUMENT…………………………………………………….……9

    A.   Applicable Pleading Standards………………………..…………….9

    B.   The Complaint Adequately Alleges Scienter…………………..…...10

       1.   The Scienter Standard…………………………………….……10

       2.   Plaintiff's Detailed Allegations of Scienter…………….….……..12

       3.   Plaintiff's Confidential Witnesses Support Scienter…………..…….22

       4.   The Core Operations Doctrine Applies……………………..…….24

       5.   The Doctrines of Corporate or Collective Scienter  Support a
          Strong Inference of Scienter Against Kid Brands…………….….…28

    C.   Defendants' Materiality Challenges Must Fail………………..……...31

       1.    Defendendants Had a Duty to Disclose ……………………........32

       2.   Defendants' Statements Cannot Be Dismissed As Puffery……........37

IV. CONCLUSION…………………………………………………..…......40

# TABLE OF AUTHORITIES

<u>CASES</u>

*ABN AMRO, Inc. v. Capital Int'l Ltd.*,
595 F. Supp. 2d 805 (N.D. Ill. 2008)……………………………….……...……12

*In re Advanta Corp. Sec. Litig.*,
180 F.3d 525 (3d Cir. 1999)……………………………………….….……..11

*In re Aetna Inc. Sec. Litig.*,
34 F.Supp.2d 935 (E.D. Pa. 1999)...…………………………….…….…... 27

*In re Alliance Pharm. Corp. Sec. Litig.*,
279 F. Supp. 2d 171 (S.D.N.Y. 2003) ……………………………...……...34

*In re Alpharma Inc. Sec. Litig.*,
372 F.3d 137 (3d Cir. 2004)……………………………………….……...14

*In re Anadigics, Inc., Sec. Litig.*,
CIV.A. 08-5572 MLC, 2011 WL 4594845 (D.N.J. Sept. 30, 2011)…………..… 22

*Angres v. Smallworldwide,*
*326 PLC*, 94 F.Supp.2d 1167 (D. Colo.)……………………………………..… 27

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
 324 F.Supp. 2d 474 (S.D.N.Y. 2004)….……………………………..... 25, 28

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)……….……………………………………..………………..36

*Brumbaugh v. Wave Sys. Corp.*,
416 F. Supp. 2d 239 (D. Mass. 2006)………………………………...………...37

*California Public Employees' Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004)……………………………………….…………….23

*City of Roseville emps.' Ret. Sys. v. Horizon Lines, Inc.*,
Nos. 10-2788, 10-3815, 2011 WL 3695897 (3d Cir. Aug. 24, 2011)………..…...30

*In re Complete Mgmt. Inc. Sec. Litig.*,
153 F. Supp. 2d 314 (S.D.N.Y. 2001)……………………………..…………...26

*DeBenedictis v. Merrill Lynch & Co.*,
492 F.3d 209 (3d Cir. 2007)…………………………………………..…………..10

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)…………………………..…………...25

*Galati v. Commerce Bancorp, Inc.*,
No. Civ. 04-3252 (RBK), 2005 WL 3797764 (D.N.J. Nov. 7, 2005)………..….. 35

*Glazer Capital Mgmt., L.P. v. Magistri*,
549 F.3d 736 (9th Cir. 2008)………………………………………..…….....29, 30

*Gordon v. Wawa, Inc.*,
388 F.3d 78 (3d Cir. 2004)…………………………………..…………………10

*Hughes v. Huron Consulting Group, Inc.*,
 733 F.Supp.2d 943 (N.D. Ill. 2010)…………………………...………………… 17

*Institutional Investors Grp. v. Avaya, Inc.*,
563 F.3d 242 (3d Cir. 2009)…………………………..………………10, 12, 24, 28

*In re Lowen Group, Inc.*,
2004 WL 1853137(E.D. Pa. Aug. 18, 2004)………………..………………… 24

*Local 731 I.B. of T. Excavators and Pavers Pension Trust Fund v. Swanson*, No.
09-799, 2011 WL 2444675 (D. Del. June 14, 2011)………………….……36, 40

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
513 F.3d 702 (7th Cir. 2008)…………………………………..……….26, 29, 30

*In re Marsh & McLennan Co. Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006)………………………..…………...37

*Matrixx Initiatives Inc. v. Siracusano*,
131 S.Ct. 1309 (2011)…………………………………………..………... passim

*In re McKesson HBOC, Inc. Sec. Litig.*,

126 F.Supp.2d 1248 (N.D. Cal. 2000)…………………..…………………… 17

*McMahan & Co. v. Wherehouse Entm't., Inc.*,
900 F.2d 576, 579 (2d Cir. 1990)………………………..………………33, 35

*In re Meta Fin. Group, Inc.*,
C 10-4108-MWB, 2011 WL 2893625 (N.D. Iowa July 18, 2011)…………..…...16

*Morgan v. AXT, Inc.*,
No. C 04-4362 MJJ, 2005 U.S. Dist. LEXIS 42346, (N.D. Cal. Sept. 23, 2005)……………………………………………………………...……...38

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)……………………………...…………..….……12, 13

*In re Party City Sec. Litig.*,
147 F. Supp. 2d 282 (D.N.J. 2001)……………………………...……….11, 13

*In re PDI Sec. Litig.*,
No. 02-CV-0211, 2005 WL 2009892 (D.N.J. Aug. 17, 2005)………….....……… 31

*Rosen v. Textron*,
321 F.Supp. 2d 308 (D.R.I. 2004)……………………………..………….37

*Shapiro v. UJB Financial Corp.*,
964 F.2d 272 (3d Cir. 1992)……………………………..………………… 31

*South Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2010)……………………………..……………..28

*In* re *Suprema Specialties, Inc. Sec. Litig.*,
438 F. 3d 256 (3d. Cir. 2006)……………........................................40

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190 (2d Cir. 2008)………………………………….…………..29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ……………………………………..………….6, 11, 12, 24

*In re Tel–Save Sec. Litig.*,

1999 WL 999427 (E.D. Pa. Oct. 19, 1999)……………………..…………………....24

*In re Worldcom Sec. Litig.*,
352 F. Supp. 2d 472 (S.D.N.Y. 2005)…………………..……………………...29

*In re Xerox Corp. ERISA Litig.*,
483 F. Supp. 2d 206 (D. Conn. 2007)……………………………..…..…………...10

*Zavolta v. Lord, Abbett & Co.*,
No. 08-cv-04546, 2011 WL 686546 (D.N.J. Feb. 24, 2010)…………...……….... 29

RULES

Fed. R. Civ. P. 15…………………………………………………...…………..40

## I. PRELIMINARY STATEMENT

Despite having no opportunity to conduct discovery, Plaintiff has conducted a rigorous informal investigation and the Amended Class Action Complaint (the "Complaint") meets all of the requirements of the Private Securities Litigation Reform Act ("PSLRA") and Rule 9(b). In support of his allegations, Plaintiff cites, *inter alia*: the Company's conceded violations of U.S. Customs laws which resulted in millions of dollars of customs duties owed and additional monetary penalties imposed by the U.S. Government on the Company relating to wrongdoing at multiple subsidiaries; well-placed confidential witnesses – including former employees and consultants of the Company with knowledge of the allegations set forth in the Complaint; and the Company's own admissions regarding misconduct by the Company during the Class Period. *See, e.g.*, ¶¶9, 10, 16, 57, 94, 95.[1]

The Complaint alleges in detail the devastating first partial disclosure by the Company on March 15, 2011. ¶¶19, 76-77. Among other shocking revelations of the true, previously-concealed facts that resulted in a stock drop so significant that Defendants do not challenge causation stemming from that disclosure or the additional revelations between March 15, 2011 and the end of the Class Period, the March 15, 2011, release belatedly admits: the Board of Directors had previously

initiated an investigation into potential violations of U.S. law; the Board had previously appointed a special committee that had hired the Skadden Arps firm, counsel for the Company in this litigation; the investigation had already reached the conclusion that there was "misconduct on the part of certain [Kid Brands, Inc. subsidiary] LaJobi employees in connection with the incorrect payment of duties;" and the Company had already reached the decision to terminate two high-level executives –Larry Bivona, the former LaJobi president, and its Managing Director of Operations.[2] ¶¶18, 20.

Tellingly, Defendants seek to paint the March 15, 2011, partial disclosure as evidence of their "Good Faith Actions Upon Discovering Issues At LaJobi."  Co. Br. at 6.  In that release, Defendants congratulate themselves for setting up a Special Committee and hiring Skadden Arps, and for firing the two purportedly rogue employees whom they claim engaged in the wrongdoing and violations of law at the LaJobi subsidiary and seek to wipe their hands of the matter. Unfortunately for Defendants, the well-pleaded allegations of the Complaint strongly support a countervailing inference that is a far cry from this convenient storyline: namely, Defendants engaged in a pattern and practice of customs violations at multiple subsidiaries in order to materially improve their financial

---

[1] All "¶__" references are to the Complaint.

bottom line. ¶9. These violations were directed from the top and predate by two years Kid Brands' acquisition of LaJobi and the hiring of the very key rogue employee (Mr. Bivona) upon whom Defendants seek to pin the blame for the entire fraud. Indeed, the Company has since admitted that customs violations occurred at at least two other subsidiaries – Kids Line and CoCaLo – which violations go back at least to 2006 – approximately two years before LaJobi was acquired and Mr. Bivona was hired and had any dealings with the Company. ¶¶9, 90, 91.

Since the filing of the Amended Complaint on September 26, 2011, the facts of this case have become still more compelling as additional highly damaging information has been disclosed regarding the Company's misconduct and additional investigations relating thereto, which add further strong support to Plaintiff's well-pleaded Complaint. Of course, as Defendants themselves concede, the Court may take judicial notice of such information, contained in the Company's own public filing—*see* November 8, 2011, 10Q, attached to the accompanying Declaration of Jeffrey Herrmann ("Herrmann Decl.") as Exhibit A.

Interestingly, by seeking to pin the blame on Mr. Bivona, Defendants now claim to have a basis to refuse to pay Mr. Bivona up to $15 million in earnout consideration related to his employment contract. As disclosed in the Company's November 11, 2011, 10Q, which Defendants do not attach to their own

---

[2] Though unidentified by Defendants, Lead Plaintiff's investigation has determined

declarations in support of their motions despite including other documents that post-date the filing of the Amended Complaint:

> On July 25, 2011, the Company received a letter from counsel to Lawrence Bivona demanding payment of the LaJobi Earnout Consideration to Mr. Bivona in the amount of $15 million. In addition, on July 25, 2011, the Company received a letter from counsel to Mr. Bivona alleging that Mr. Bivona's termination by LaJobi "for cause", effective March 14, 2011, violated his employment agreement and demanding payment to Mr. Bivona of amounts purportedly due under such employment agreement. The Company does not intend to pay the LaJobi Earnout Consideration to Mr. Bivona and believes that Mr. Bivona was properly terminated "for cause" pursuant to his employment agreement, and the Company has so advised counsel for Mr. Bivona.

Mr. Bivona's above-referenced demand letter regarding his claim that he was wrongfully terminated and is entitled to $15 million in earnout consideration further supports Plaintiff's allegations that Mr. Bivona was nothing but a convenient scapegoat who followed orders from Company management. ¶¶20-21.

The November 8, 2011, 10Q further discloses that both the Securities Exchange Commission and the United States Attorney's Office ("USAO") for the District of New Jersey are both currently conducting "investigations" of the Company, which commenced after this lawsuit was filed.  *See* Herrmann Decl. at Ex. A. The Company has provided to the SEC "the findings of its internal

---

that the fired LaJobi Managing Director of Operations was John Sandiford. ¶20.

investigation of LaJobi's customs and Asia staffing practices." See *id*. The USAO has requested "information relating to LaJobi…and additional documents." See *id*.

By the start of the Class Period, the Complaint alleges that Defendants were aware of or recklessly disregarded the routine customs and other legal violations which enabled the Company to materially inflate its financial results and posed the very real risk of liability (a prospect that became reality). ¶9. These facts constitute material information and had to be disclosed under Section 10(b), Rule 10b-5, and Item 303 of SEC Regulation S-K ("Item 303") thus rendering statements made during the Class Period materially false and misleading for failure to disclose these facts.

In an analogous recent case, *Matrixx Initiatives Inc. v. Siracusano*, 131 S.Ct. 1309, 1311 (2011), the United States Supreme Court unanimously ruled that a drug company that "failed to disclose reports of a possible link between its leading product, Zicam Cold Remedy, and loss of smell" in a small number of patients violated Section 10(b) and Rule 10(b)(5). The Court rejected claims by defendant that the incidents need not be disclosed because they were "anecdotal" and not "statistically significant." *Id*. at 1319. The Court found that the risk of loss was material and needed to be disclosed even though it could not be quantified and the connection between their product and the alleged injury was not established scientifically. *Id*. at 1319-20. Here, as in *Matrixx*, Defendants failed to disclose it

had engaged in a pattern and practice of violating customs requirements throughout the Class Period, thereby artificially inflating the Company's revenues. ¶9. The failure to disclose rendered the Company's Class Period positive statements about its business, its results, and its outlook materially false and misleading when made.

Somewhat bizarrely, in a parting shot in the final pages of the motion to dismiss at pp. 30-31, Defendants take issue with the allegation in the Complaint relating to a November 4, 2010, disclosure, arguing that Plaintiff engaged in "tortured efforts" to "incorrectly insinuate[e]" that "Kid Brands was under investigation for a safety issue." Co. Br. at 31.  This argument is nothing short of extraordinary in light of Defendants' admissions in the November 8, 2011, 10Q that the Company is under investigation by not one but two federal agencies whose findings may well directly impact, and may even stem from, Plaintiff's Complaint.

Plaintiff has alleged a strong case, and Defendants, unable to articulate legal insufficiencies with Plaintiff's allegations, instead attack the factual credibility of the Complaint's content.  Of course, Plaintiff's well-pleaded allegations – corroborated by well-placed sources -- must be accepted as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). For these reasons, discussed in detail below, the motion to dismiss should be denied.

## II. FACTUAL BACKGROUND

Kid Brands, Inc. ("Kid Brands" or the "Company") designs, imports,

markets and distributes branded infant and juvenile consumer products through various subsidiaries, including Kids Line, LLC ("Kids Line"), Sassy, Inc. ("Sassy"), LaJobi Industries, Inc. ("LaJobi"), and CoCaLo, Inc ("CoCaLo"). ¶4. Kid Brands' business focuses largely on baby furniture and other products, which are imported from China at bargain prices and sold in Western markets for profit. ¶6. Anti-dumping laws place high duties on certain countries, including China, and on specific manufacturers within countries in an effort to prevent unfair trade practices. ¶7. Many importers and manufacturers attempt to circumvent these laws by disguising the Country or manufacturer of origin of their products. ¶¶7-8. Companies found in violations of these laws can incur charges for unpaid duties and hefty fines and penalties. ¶8.

From March 26, 2010 through August 16, 2011 (the "Class Period"), Kid Brands published a series of statements that emphasized the purported accuracy and effectiveness of the Company's internal disclosure controls and also touted the earnings of its subsidiaries while downplaying liabilities. ¶1. During this time, Defendants knew or recklessly disregarded that these statements were materially false and misleading because three out of Kid Brands' four subsidiaries were engaging in illegal conduct and improper staffing practices, upon which the inflated earnings relied upon. ¶9. The Complaint further shows that three former employees of the Company attested to a pattern of violations of customs laws, non-

compliance with Sarbanes Oxley Act requirements, and inaccurate data, that pervaded the Company's entire business practice and resulted in favorable, but inaccurate profit data. ¶¶10, 16, 57. As a result of the Companies' illegal and improper business practices, the stock price of Kid Brands' securities traded at artificially inflated levels. *See, eg.*, ¶¶9, 27, 70, 82, 94.

It was not until March 15, 2011 that Kid Brands began disclosing the truth about its operations. ¶76. On March 15, 2011, Defendants announced the termination of two high-level executives at LaJobi, including President Larry Bivona, and admitted to violations of customs laws which would result in costs of $7 million for customs duty owed, and a fine of up to 1 times the customs duties. *Id*. They announced that the findings of violations were the result of an investigation initiated by the Board of Directors and that the investigation would be ongoing. *Id*. Upon disclosing the improper practices of LaJobi, Kid Brands terminated Mr. Bivona in the final weeks of his consulting contract with the Company. *Id*. In addition to his termination, the Company determined that the Company did not owe Mr. Bivona the $12-$15 million Earn out Consideration that was about to become due to him, as a result of 3 years of meeting the performance goals set by the company at the time of the purchase of JaJobi in 2008. *Id*. On July 25, 2011, Mr. Bivona sent two letters to the Company, one from himself and the other from his attorney, arguing that his "termination for cause" violated his

employment contract and demanding payment of his $15 million Earnout Compensation. ¶18.

Over the next five months, Defendants continued to mislead investors regarding the extent of their violations, until August 15, 2011, when Kid Brand's 10-Q disclosed that Kids Line and CoCaLo had also been engaging in the same illegal conduct as LaJobi. ¶90. These companies would also be facing additional costs of $2.4 million for customs duty owed, with the possibility of additional costs and fines being levied against the Company for violations that occurred from 2006 to 2010. *Id*. On September 12, 2011, Kid Brands disclosed that Defendant Crain had resigned and had been replaced by Raphael Benaroya. *See* Herrmann Decl. at Ex. B.

The revelations of the true, previously-concealed facts between March 15, 2011 and August 15, 2011 caused the Kid Brands stock price to fall precipitously on exceptionally high trade volume on the days following the disclosures. ¶¶77, 92. All told, the price of the share plummeted from a closing price of $9.24 on March 14, 2011 to $6.91 on March 15, 2011, and then to $3.65 on August 16, 2011. *Id*.

## III.   ARGUMENT

### A.   Applicable Pleading Standards

To state a claim under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, a plaintiff must allege that defendant, in connection with

the purchase or sale of a security, made a false statement or an omission of a material fact, with scienter, and that reliance on defendant's action caused injury to the plaintiff.  *Institutional Investors Grp. v. Avaya, Inc.*, 563 F.3d 242, 251 (3d Cir. 2009). When analyzing a complaint for failure to state a claim pursuant to Rule 12(b)(6), the Court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." *DeBenedictis v. Merrill Lynch & Co.*, 492 F.3d 209, 215 (3d Cir. 2007) (citation omitted).  "Dismissal under Rule 12(b)(6) is inappropriate 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Gordon v. Wawa, Inc.*, 388 F.3d 78, 80-81 (3d Cir. 2004) (citation omitted).  The Court's inquiry is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his claims." *In re Xerox Corp. ERISA Litig.*, 483 F. Supp. 2d 206, 211 (D. Conn. 2007) (citations omitted).

### B. The Complaint Adequately Alleges Scienter

### 1. The Scienter Standard

In this Circuit, scienter can be pled by alleging facts giving rise to a "strong inference" of "either reckless or conscious behavior." *Avaya, Inc.*, 564 F.3d at 269 (citation omitted). In *Tellabs*, the Supreme Court articulated the calculus for determining whether the inference of scienter has been adequately pled, holding:

"[a] complaint will survive . . . if a reasonable person would deem the inference of scienter cogent and at least *as* compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. It need only be "at least as compelling" (*i.e.*, in "equipoise") as any opposing inference of scienter. *Id*. The Court cautioned that "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* (citations omitted). Therefore, the Court should "assess all the allegations holistically," and even "vague or ambiguous" allegations must be considered. *Id.*

The allegations here support a strong inference of recklessness or knowledge by Defendants, which inference is far more plausible than any competing exculpatory inference. A reckless statement is defined as "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 535 (3d Cir. 1999). The Complaint cogently alleges Defendants' (i) "knowledge of facts or access to information contradicting their public statements," *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 315 (D.N.J. 2001); (ii) "[a]n egregious refusal to see the obvious, or to investigate the doubtful," *In re Party City Sec. Litig.*, 147 F. Supp. 2d at 315; or (iii) failure "to review or check information they

had a duty to monitor, *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).[3]

Defendants attempt to isolate each scienter allegation and dismiss it as insufficient. Co. Br. at 14-26. This approach of considering individualized allegations in isolation does not comport with *Tellabs*. *See Avaya*, 564 F.3d at 272 ("Given this instruction [from *Tellabs*], we are hesitant to formulate categorical rules about the sufficiency of different types of allegations in the abstract."). "Each case will present a different configuration of factual allegations, and it is the composite picture, not the isolated components, that judges must evaluate in the last instance." *Id*. at 273.

### 2.  Plaintiff's Detailed Allegations of Scienter

The Complaint alleges numerous indicia of Defendants' scienter, including, but not limited to: the violations of U.S. Customs laws by the Company and related fines; reports from well-placed witnesses with knowledge of Kid Brands' operations; Kid Brands' *own* statements and admissions regarding senior management's direct involvement with all of its subsidiaries; Kid Brands' admitted own investigation into importing and staffing practices; the legal dispute between the Company and Mr. Bivona; and LaJobi, CoCaLo, and Kids Line (three of four

---

[3] The Court need not reach the conclusion that the defendants were reckless, for the plaintiff will prevail if "the Court finds it cannot determine, as a matter of law, that Defendants were not reckless." *ABN AMRO, Inc. v. Capital Int'l Ltd*., 595 F. Supp. 2d 805, 842 (N.D. Ill. 2008).

wholly-owned Kid Brands' subsidiaries) as Kid Brands' core business operations. *See, e.g.*, ¶¶9, 10, 16, 57, 94, 95.[4]

The Complaint is replete with allegations that Defendants knew or recklessly disregarded that three out of Kid Brands' four business entities posted inflated earnings on the basis of illegal conduct and that Kid Brands had engaged in improper staffing practices across Asia. *See, e.g.*, ¶¶9, 10, 16, 57, 94, 95. Yet Defendants continuously touted, *inter alia*, the purported accuracy and effectiveness of the Company's internal disclosure controls and also touted the earnings of its subsidiaries while downplaying liabilities. *See, e.g.*, ¶¶9, 44, 46, 48, 50, 52, 54, 58, 60, 64, 75, 76, 79, 85. Such statements were made in the Company's public filings during the Class Period, which were signed by Defendants Crain and Paglinco, respectively the Chief Executive Officer and Chief Accounting Officer of Kid Brands. As such, the Complaint contains numerous allegations of Defendants' "conscious misbehavior or recklessness" — that the Defendants "engaged in deliberately illegal behavior," "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *E.g.*, ¶¶ 9-10, 12-15, 17-21; *In re Party City Sec. Litig.*, 147 F. Supp. 2d at 315; *Novak*, 216 F.3d at 308, 311.

---

Defendants incorrectly argue that a pre-*Tellabs* and pre-*Matrixx* case controls this matter. Co. Br. at 19. (citing *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137 (3d Cir. 2004)) ("[T]he Third Circuit's decision in *Alpharma* is determinative here."). The case is easily distinguishable and actually supports Plaintiff's inference of scienter. In *Alpharma*, the Third Circuit found that plaintiffs failed to link members of Alpharma's management to wrongdoing at one of Alpharma's Brazilian subsidiaries or that they had any knowledge of wrongdoing. 372 F.3d 150-51. The Third Circuit found that "the Complaint simply alleges that a sales manager in AHD's Brazil division notified employees in New Jersey of the accounting irregularities in Brazil. There was no investigation of these allegations…" *Id.* at 151. More importantly, the Court held that "the Complaint is devoid of any allegations which would establish that AHD's Brazil division was so central to Alpharma's business that its increased revenue figures should have received particular attention from company executives." *Id.* In sum, only one small subsidiary was alleged to wrongdoing.

Here, by contrast, the Complaint alleges that at least three of four Kid Brands' subsidiaries were participating in the same pattern of illegal conduct to inflate the Company's revenues. It would strain credulity to argue that this far-

---

[4] The Court can take judicial notice of additional indicia of scienter, including the abrupt resignation of Defendant Crain and the multiple investigations of the Company by the SEC and USAO. *See* Herrmann Decl. Exs. A-B.

reaching practice would not have been known by the Company's senior executives or at minimum recklessly disregarded by them. Additionally, the Company's November 2011 10Q, Defendants revealed that LaJobi was selected by U.S. Customs in late December 2010 for a Focus Assessment of its import practices and procedures. The Focus Assessment commenced on January 19, 2011. Defendants also disclosed that "[i]n preparing for the Focused Assessment, the Company found certain potential issues with respect to LaJobi's import practices." Unlike in *Alpharma*, the Company was sufficiently concerned enough about the "potential issues" that it retained the Skadden Arps firm to conduct an investigation. ¶76. These "potential issues" were not disclosed until March 15, 2011, despite Defendants' knowledge of these issues in or around December of 2010. More disturbingly, although the Company had been specifically selected by the U.S. Government for a Focused Assessment in December 2010, Defendants concealed this specific fact until November 2011, despite making various announcements and filings in the interim (including the March 15, 2011 disclosure and the other partial disclosures during the Class Period), all of which required disclosure.

While Defendants may argue that these facts do not support that they acted recklessly or knowingly because these were only "potential issues," the Supreme Court has dismissed this very type of argument. *See Matrixx*, 131 S. Ct. at 1324. In *Matrixx*, the Supreme Court rejected the defendant's argument that "the most

obvious inference is that petitioners did not disclose the [adverse] [reports] simply because petitioners believed they were far too few ... to indicate anything meaningful about adverse reactions to use of Zicam." *Id.*  Conversely, the Supreme Court found that "[t]he inference that Matrixx acted recklessly (or intentionally, for that matter) is at least as compelling, if not more compelling, than the inference that it simply thought the reports did not indicate anything meaningful about adverse reactions." *Id.* Supporting its finding of scienter, the Supreme Court held, "Matrixx was sufficiently concerned about the information it received that it informed Linschoten that it had hired a consultant to review the product…" *Id.*

Similar to Matrixx, Kid Brands was also sufficiently concerned about the information it found regarding "potential [LaJobi import] issues" that it hired Skadden Arps to conduct an investigation. ¶76. See *Matrixx*, 131 S. Ct. at 1324.5

The fact that Crain resigned his position as CEO and his membership on the Board of Directors, effective immediately, on September 12, 2011, less than one

---

[5] In *In re Meta Fin. Group, Inc.*, C 10-4108-MWB, 2011 WL 2893625 (N.D. Iowa July 18, 2011), the plaintiffs made similar allegations as here: "the plaintiffs allege[d] that because the defendants knew that the [Office of Thrift Supervision] investigation was occurring and that OTS had indicated that there were problems, the defendants knew of or recklessly disregarded the material falsity of their statements or knowingly or recklessly omitted material information from them." Thus, findings from a known government investigation helped support the inference of scienter. In denying the defendants' motion to dismiss in full, the court in *Meta* found, "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference." *Id.*

month after the August 15, 2011 disclosure is also probative of scienter. *See* Herrmann Decl. Ex. B.; *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1274 (N.D. Cal. 2000) (termination of key personnel supports a finding of scienter); *Hughes v. Huron Consulting Group, Inc*., 733 F.Supp.2d 943, 949 (N.D. Ill. 2010) ("To the extent the particular factual allegations not expressly addressed here—… the individual defendants' resignations—may further contribute to a "strong inference" of scienter, these allegations are merely icing on the cake, and I need not linger on whether they are sufficient, alone or in combination, to plead scienter.").

Defendants argue that "any inference of fraudulent intent on the part of Kid Brands is simply not cogent and is less compelling than the competing non-fraudulent inference. Co. Br. at 25. They even go as far as portraying Kid Brands as the quintessential promoter of corporate diligence. Co. Br. at 25 ("Kid Brands itself identified the subsidiary violations at issue here, took immediate steps to remedy the situation and promptly disclosed these facts to the investing public. These facts demonstrate a company that acted diligently, not with fraudulent intent"). Not so.

LaJobi, CoCaLo, and Kids Line violations of customs laws saved Kid Brands millions of dollars. ¶11. Kid Brands' 10-K filing for the year ended

December 31, 2010, estimated custom charges from anti-dumping violations at $6.9 million.  Moreover, Kid Brands filed an 8-K on August 16, 2010 that estimated an additional $.3 million in customs charges from LaJobi violations and $2.2 million in anticipated customs charges arising from violations by CoCaLo and Kids Line dating back to August 2006.  In total, Kid Brands saved nearly $10 million from its bottom line by skirting U.S. customs laws, which it now must pay back with interest. ¶11.  In fact, one way in which Kid Brands was able to accomplish such subterfuge was through a company called L&J Industries in Asia. ¶12. Mr. Bivona, the former President of LaJobi, along with his family members, established L&J Industries ("L&J") in Asia to facilitate the shipment of goods from Asian ports to the United States. ¶12. In connection with the acquisition of LaJobi, Kid Brands entered into a services agreement through which Kid Brands utilized the full time services of approximately 28 individuals working with L&J. ¶12. Eventually, Kid Brands paid for the services of all or nearly all of the L&J employees based in Hong Kong, China, Vietnam and Thailand. ¶12.

Further, Kid Brands acknowledged in its Form 10-Q for the quarter ending June 30, 2011 that Kid Brands' staffing and payment practices at L&J likely violated the civil, criminal and regulatory laws of some, if not all of these countries due to, amongst other things, foreign regulations requiring disclosure in connection with wire transfers. ¶13. Because the inspectors in China received instructions

from a Kid Brands quality control department based in the United States,
Defendants knew or recklessly disregarded its staffing arrangements with
employees working abroad, specifically China. ¶14. Another way Kid Brands was
able to circumvent U.S. and foreign laws for such a long period of time without
detection was by shirking its duties under U.S. law to disclose the true financial
condition of the Company. ¶16. Kid Brands' own employees found that the
Company's disclosures missed the mark. ¶16.

Strong evidence of scienter is provided by the fact that both the SEC and the
USAO are now investigating the Company. Kid Brands received a letter from the
SEC on June 20, 2011 notifying the Company that the SEC initiated an
investigation into Kid Brands and requesting various documents. ¶17.
Additionally, per the November 8, 2011, 10Q, on August 19, 2011, the United
States Attorney's Office for the District of New Jersey contacted Company
counsel, requesting information relating to LaJobi previously provided by the
Company to U.S. Customs and the SEC, as well as additional documents.

The firings of Mssrs. Bivona and Sandiford, the Managing Director of
Operations at LaJobi, were a superficial attempt by Kid Brands to hold someone
accountable for the customs misconduct. ¶20. When LaJobi co-founders Larry and
Joe Bivona sold the company to Kid Brands in 2008, Joe retired, but Larry wanted
to work for a few more years. ¶20. As a result, Kid Brands offered him a three-year

contract to remain as LaJobi President. ¶20. Kid Brands' firing of Bivona in March of 2011 was therefore of little consequence because his contract was set to expire in 2011 anyway. ¶20. Likewise, Sandiford's firing had little effect. ¶20. Kid Brands did not publicly disclose the name of its fired Managing Director of Operations, and Plaintiff was only able to discover this information after significant investigation efforts. ¶20. Kid Brands portrayed the terminations of Bivona and Sandiford as the Company's swift reaction to the aberrant acts of two vigilante executives. ¶20. Tellingly, two of Kid Brands' other subsidiaries, Kids Line and CoCaLo—with which Bivona and Sandiford had no connection—were concurrently engaging in the exact same pattern of conduct as LaJobi. ¶20. In fact, as noted in Kid Brands' 10-Q for the quarter ended June 30, 2011, Kids Line and CoCaLo had been incorrectly classifying and describing products imported from Asia to avoid paying import duties since as early as 2006. ¶20.

Further providing evidence of scienter, Kid Brands' accusations against Bivona allowed the Company to save millions of dollars in "Earnout Consideration." ¶21. A portion of acquisition of LaJobi included contingent consideration based on the achievement of performance milestones. ¶21. This "Earnout Consideration" factored in annual growth and equated to a percentage of the "Agreed Enterprise Value" as of the "Measurement Date." ¶21. Based on these numbers, Kid Brands determined that it owed the LaJobi sellers (the Bivonas) $12-

15 million, and owed the financial institution responsible for facilitating the acquisition 1% of the Agreed Enterprise Value. ¶21.  In light of the misconduct purportedly by Bivona and Sandiford that gave rise to customs fees attributable to LaJobi, Kid Brands determined that it owes not a penny of the $12-15 million. ¶21.

Accordingly, the cogent and compelling inference is that once it was discovered that Defendants were violating anti-dumping laws by avoiding duties on the products LaJobi, CoCaLo, and Kids Line imported from China and elsewhere, as well as Kid Brands' illegal staffing practices overseas, Bivona and Sandiford were set up as the scapegoats to take the fall and were terminated under the guise of a Company acting swiftly and diligently.  Further evidencing this inference is that Defendants refused to pay Bivona up to $15 million in Earnout Consideration and Bivona is currently demanding payment for same.  ¶21. Moreover, it would be absurd to suggest that the same customs violations that had been occurring at CoCaLo and Kids Line since 2006—two years before Bivona was in the picture or LaJobi was even acquired—were the result of two rogue executives at LaJobi and not done at the direction of or with the knowledge of Defendants. ¶5 (LaJobi was acquired by Kid Brands in 2008); ¶¶20, 23 (Customs violations were occurring at CoCaLo and Kids Line since 2006). Defendants would have this Court believe that Bivona and Sandiford, two rogue LaJobi employees, independently concocted the exact same customs scheme that had been

occurring at CoCaLo and Kids Line since 2006. Most importantly, although the Company alleged Bivona and Sandiford were terminated swiftly and diligently upon discovery of their rogue, illegal activities at LaJobi, no one from CoCaLo or Kids Line was terminated as result of the same illegal conduct occurring at these two Kid Brands' subsidiaries.

### 3.  Plaintiffs' Confidential Witnesses Support Scienter

Plaintiff's allegations are supported by detailed reports from three well-placed Confidential Witnesses ("CWs"). *See* ¶¶10, 16, 57. These CWs provide a cogent inside view into Defendants' actions and operations during the Class Period.

A "plaintiff may provide factual support for a complaint through confidential sources… when the confidential sources are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the [confidential] source would possess the information alleged." *In re Anadigics, Inc., Sec. Litig*., CIVA. 08-5572 MLC, 2011 WL 4594845 (D.N.J. Sept. 30, 2011). "The *Novak* approach to assessing the particularity of allegations made on information and belief necessarily entails an examination of the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the

22

allegations, and similar indicia." *California Public Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147-48 (3d Cir. 2004).

Plaintiff's description of his sources readily meets the Third Circuit standard for identification of witnesses. *See, e.g., Chubb Corp.*, 394 F.3d at 147-48 (adopting the Second Circuit standard that an unnamed source must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"). CW1 is described as a former Distribution Manager at LaJobi from May 2000 through November 2010 who consistently handled shipments from both Chinese and Vietnamese vendors—thus supporting the allegation that CW1 was extremely well-placed and in a position to know and in fact knew the information alleged. ¶10. Additionally, CW1 alleged, *inter alia*, that the "air of wrongdoing was so pervasive at the LaJobi distribution department that the customs violations did not surprise [him/her] at all." ¶10.

CW2, a Sarbanes-Oxley Compliance Consultant, also addressed how Kid Brands was able to circumvent U.S. and foreign laws for such a long period of time without detection. ¶16. Despite attesting to the accuracy of Kid Brands' financial statements and the viability of Kid Brands' internal controls in their Sarbanes Oxley certifications, LaJobi had been "singularly uncooperative in complying with Sarbanes Oxley requirements," the key provisions of which require strict internal

23

disclosure controls and procedures, and the systems put in place did not produce accurate data, as described by CW3. ¶¶16, 57. CW2 was hired to prevent the exact type of wrongful conduct alleged herein. Because the customs violations saved the Company millions of dollars in unpaid import duties and the non-disclosure of such illegal savings made the Kid Brands' financial position look much more favorable to investors, Defendants failed to establish an effective system of disclosure controls and procedures as of March 31, 2010.  ¶57. [6]

### 4.  The Core Operations Doctrine Applies

Under the "core operations" doctrine, knowledge of the falsity of a company's statements can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's statements were false when issued. *See In re Lowen Group, Inc*., 2004 WL 1853137, at *22 (E.D. Pa. Aug. 18, 2004); *In re Tel–Save Sec. Litig.,* 1999 WL 999427, at *5 (E.D. Pa. Oct. 19, 1999)) ("if a plaintiff

---

[6] The Third Circuit has noted in *Avaya* that scienter may be adequately alleged where "[i]t is true that Shareholders do not point to any particular document or conversation that would have informed Peterson or McGuire of unusual discounting during the class period. The existence of such a direct link would fortify Shareholders' allegations that defendants' statements about discounting were knowingly or recklessly false. But the Supreme Court has made clear that plaintiffs' allegations of scienter 'need not be irrefutable, *i.e.,* of the "smoking-gun" genre.'" *Tellabs,* 127 S.Ct. at 2510. Instead, our inquiry is 'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter.' *Id.* at 2509." *Avaya*, 564 F.3d at 268-69.

pleads alleged fraud concerning the corporation's core business and the defendant held a position from which he would have been aware of the true facts and misleading disclosures, scienter is pleaded sufficiently."); *see also In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp. 2d 474, 489-92 (S.D.N.Y. 2004); *Freudenberg v. E\*Trade Fin. Corp.,* 712 F. Supp. 2d 171, 199 (S.D.N.Y. 2010).

Here, Individual Defendants Crain and Paglinco were the highest-level officers of Kid Brands. ¶¶34-35. "Accordingly, if a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company." *Atlas Air*, 324 F. Supp. 2d at 489.

Moreover, the Complaint satisfies the "core operations" doctrine requirements. LaJobi, CoCaLo, and Kids Line were three of only four subsidiaries of the Company—all of which are in the Company's core business of infant and juvenile consumer products and were engaged in the same type of illegal conduct. ¶¶5, 8, 13, 15, 18, 20. Kid Brands is a leading designer, importer, marketer and distributor of infant and juvenile consumer products. ¶6; *see also* March 31, 2010 Form 10-Q. The Seventh Circuit's decision on remand in *Tellabs* found that because the allegations concerned the company's most important products, the

25

court found it "very hard to credit" the assertion "[t]hat no member of [Tellabs']
senior management who was involved in authorizing or making public statements
about the demand for the key products knew that they were false" and noted that
"no plausible story has yet been told by the defendants that might dispel our
incredulity." *Makor Issues & Rights, Ltd. v. Tellabs, Inc*., 513 F.3d 702, 709 (7th
Cir. 2008) (emphasis added).

Further, in *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 325-
26 (S.D.N.Y. 2001), plaintiffs alleged that defendant (CMI) was aware that a large
percentage of CMI's receivables were ultimately uncollectible because CMI was
substantially relying on revenues from GMMS, an organization egregiously issuing
self-referrals to run up fees that, and that these claims, when arbitrated, would
yield cents on the dollar. *Id*. The plaintiffs averred that the high-level officers,
including, *inter alia*, the CEO, CFO, and Vice-Chair of the Board, were aware of
the problem with receivables, but concealed this information from investors. *Id*.
Judge Buchwald, finding the complaint alleged a strong inference of scienter, held:

> It ***thoroughly strains credulity*** to imagine that the individual
> defendants, by virtue of their positions at CMI and the interactions
> with GMMS that those positions demanded, were ignorant of the
> practices of GMMS. As a practical matter, the individual defendants
> were the top management of CMI and ***it is inconceivable*** that they
> would have no conception of how GMMS, CMI's largest client-whose
> medical practice CMI contracted to manage-operated its business. For
> precisely this reason, other courts facing similar issues have held that
> on a motion to dismiss, making all reasonable assumptions in favor of
> the plaintiff includes assuming that principal managers of a

> corporation are aware of matters central to that business's operation. *See, e.g., Angres v. Smallworldwide \*326 PLC,* 94 F.Supp.2d 1167, 1175-76 (D. Colo.) (citing *In re Aetna Inc. Sec. Litig.,* 34 F.Supp.2d 935, 953-54 (E.D. Pa. 1999).

*Id*. (emphasis added).

Here, Plaintiff has similarly alleged that Defendants Crain (CEO) and Paglinco (Chief Accounting Officer) knew or recklessly disregarded that three out of Kid Brands' four business entities posted inflated earnings on the basis of illegal conduct and that Kid Brands had engaged in improper staffing practices across Asia. *See*, *e.g*., ¶¶9, 10, 16, 57, 94, 95. Yet despite Defendants' knowledge or recklessness, Defendants continuously touted the purported accuracy and effectiveness of the Company's internal disclosure controls and also touted the earnings of its subsidiaries while downplaying liabilities. *See*, *e.g*., ¶¶9, 44, 46, 48, 50, 52, 54, 58, 60, 64, 75, 76, 79, 85. Moreover, Defendants either knew or recklessly disregarded the illegal business practices of its subsidiaries because Kid Brands' own corporate filings—including but not limited to the Form 10-K for the year ending December 31, 2009 —boast the Company's internal cooperation and transparency, "[S]enior corporate management, together with senior management of our subsidiaries, coordinates the operations of all our businesses and seeks to identify cross-marketing, procurement and other complementary business opportunities." ¶15. If this statement is true, then Defendants knew or should have known about the illegal conduct by Kids Line, CoCaLo and LaJobi well before the

dates of disclosure. ¶15.

Additionally, the same illegal conduct occurring at LaJobi—allegedly only as a result of Bivona and Sandiford's unilateral conduct—had also been occurring at CoCaLo and Kids Line for approximately two years prior to the acquisition of LaJobi. Put simply, the pattern of illegal conduct at Kid Brands, *i.e.*, the customs violations and illegal staffing practices, preceded the hiring of Mr. Bivona and therefore could not have started with him. At most, Mr. Bivona merely continued the pattern of illegal conduct initiated at CoCaLo and Kids Line.

A strong inference arises that the Individual Defendants, by virtue of their high-level positions, the Company's statements about management's close involvement with and supervision of the subsidiaries, and the pattern and practice of illegal conduct at multiple subsidiaries aimed at artificially inflating the Company's bottom line, had knowledge of or recklessly disregarded those concealed adverse facts. *See Atlas Air*, 324 F. Supp. 2d at 489; *see also Avaya*, 564 F.3d at 272-73 (citing *South Ferry,* 542 F.3d at 784). Also, the fact that the pattern of illegal conduct had also been occurring at CoCaLo and Kids Line for approximately two years prior to the acquisition of LaJobi supports the inference this was not the unilateral actions of two rogue employees as Defendants claim, but instead was being directed at the highest levels of the Company.

**5. The Doctrines of Corporate or Collective Scienter Support a Strong Inference of Scienter Against Kid Brands**

Alternatively, even if the allegations of the Individual Defendants' scienter are somehow deemed insufficient, Kid Brands is not entitled to dismissal on scienter grounds. It is well settled that a corporation may be found liable if there is collective scienter on the part of its employees. *See In re Worldcom Sec. Litig.*, 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005) ("[P]laintiffs in securities fraud cases need not prove that any one individual employee of a corporate defendant also acted with scienter). Although the Third Circuit has not ruled expressly on the applicability of the "collective scienter" theory, many other Circuits have found it to be applicable. *See Glazer Capital Mgmt., L.P. v. Magistri*, 549 F.3d 736, 744-45 (9th Cir. 2008) (citing *Tellabs*, 513 F.3d at 710 (7th Cir. 2008) ("[I]t is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud.")); *see also Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) (same). In fact, in upholding the denial of the motion to dismiss in *Matrixx*, a case which involved omissions in corporate statements, the Supreme Court did not even find it necessary to distinguish between the company and its officers. *Matrixx*, 131 S.Ct. at 1309.

First, Defendants argue that the collective scienter doctrine is likely not applicable in the Third Circuit and cite *Zavolta v. Lord, Abbett & Co.,* No. 08-cv-04546, 2011 WL 686546 at *7 (D.N.J. Feb. 24, 2010), in support. Co. Br. at 19

citing *id*. ("[a]rguably, [the collective scienter] doctrine does not survive the Third Circuit's bar against group pleading in securities cases."). This conclusion does not follow. Indeed, the Seventh Circuit has barred the group pleading doctrine and still holds the collective scienter doctrine to be compatible in securities cases. *See Makor v. Tellabs,* 437 F.3d 588 (7th Cir. 2006). Further, a majority of district courts in the Ninth Circuit have held that the group pleading doctrine is no longer viable yet the Ninth Circuit still applies the collective scienter doctrine. *See Glazer Capital Mgmt., L.P.*, 549 F.3d at 744-45 (applying collective scienter doctrine).

Alternatively, Defendants improperly argue that if the collective scienter theory is viable in the Third Circuit then it must "only [be] allowed in 'extraordinary' circumstances where the magnitude of the alleged fraud was so dramatic that it must have been approved by corporate management." Co. Br. at 19, citing *City of Roseville emps.' Ret. Sys. v. Horizon Lines, Inc*., Nos. 10-2788, 10-3815, 2011 WL 3695897 (3d Cir. Aug. 24, 2011). However, no such "extraordinary circumstances" standard has been promulgated. *See City of Roseville*, 2011 WL 3695897, at *3 ("we need not decide whether we agree with either [collective scienter] approach.").

Nevertheless, the purported "extraordinary circumstances" standard referenced by Defendants has been met here. Although Defendants laud the fact that they acted swiftly and diligently in firing two rogue employees at LaJobi, three

of four Kid Brands' wholly owned subsidiaries—two of which Bivona and Sandiford had no connection—were participating in the same type of illegal activities occurring at LaJobi. Tellingly, the illegal activities at CoCaLo and Kids Line preceded Bivona by approximately two years—thus dispelling Defendants' argument that this was just the unilateral conduct of two rogue employees. Considering the sheer significance of LaJobi, CoCaLo, and Kids Line to Kid Brands' success and viability, and the fact that illegal activities were occurring at three of four subsidiaries, the allegations at least raise a strong inference of corporate scienter as to Kid Brands that is at least as plausible as any opposing inference.

### C.     Defendants' Materiality Challenges Must Fail

Materiality is a highly factual inquiry not properly suited for resolution on a motion to dismiss. *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 281 (3d Cir. 1992) ("Materiality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact."). "Only if the adequacy of the representation or the materiality of the statement is so obvious that reasonable minds could not differ, will the representation or omission be immaterial as a matter of law. *In re PDI Sec. Litig.*, No. 02-CV-0211, 2005 WL 2009892 at *12 (D.N.J. Aug. 17, 2005) (citations omitted).

31

Defendants effectively concede the materiality of the large majority of the Complaint's alleged misleading statements and omissions and instead only challenge a select few statements on the basis that either: 1) they had no duty to disclose the statements, or 2) the statements are expressions of corporate "puffery." Co. Br. at 27-30 (Part C of brief addressing materiality of statements reads "***Many*** of the Challenged Statements Are Non-Actionable As a Matter of Law"). After the recent controlling pronouncement on the materiality inquiry in *Matrixx* and recent cases criticizing the "puffery" defense, Defendants' arguments to attack the materiality of the alleged misrepresentations and omissions fail as a matter of law.

### 1.  Defendants Had a Duty to Disclose

The Supreme Court addressed the issue of materiality very recently in *Matrixx,* its controlling decision where it rejected claims that incidents need not be disclosed because they were "anecdotal" and not "statistically significant." 131 S.Ct. at 1319. While "something more" than "the mere existence of reports of adverse events" is needed, "that something more is not limited to statistical significance," *Id.* Rather, the "something more" can come from "the source, content, and context of the reports." *Id.* Here, the source of the reports of the adverse events comes from the people in the best position to report the problems, Kid Brands' own former employees. The content of those reports revealed a Company experiencing, among other things, quality control

problems, importing and distribution issues, and regulatory compliance problem, including Sarbanes Oxley certifications. ¶¶ 10, 16. A contextual inquiry would almost certainly reveal that reasonable investors would have viewed reports of these adverse events as material even though the reports did not provide statistically significant evidence of a causal link. 131 S.Ct. at 1319. Thus, Defendants' contention that the certain statements in the Complaint are immaterial is incorrect.

Defendants argue that the challenged statements are true, therefore they are not actionable.   Def Br. at 27-30.   However, literally "true" but materially incomplete or misleading statements may be actionable under the securities laws. *See McMahan & Co. v. Wherehouse Entm't., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) ("statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers").

Defendants' contention some of the alleged misleading statements either do not relate to customs duties or are not rendered untrue because of customs issues is disingenuous. Co. Br. at 27, 29.  The statements relate to the Company's quarterly or yearly growth, but omit material information regarding how Kid Brands and its

subsidiaries LaJobi, CoCaLo and Kids Line posted inflated earnings as a result of avoiding customs duties. ¶¶ 54, 66, 64, 72.

Defendants argue that statements concerning the Company's legal exposure from its 2010 quarterly filings do not relate to customs duties or are not rendered untrue because of customs issues. Co. Br. at 27, 29. In its Form 10-Q filed on May 5, 2010 and November 3, 2010, Defendants claimed that the amount of ultimate liability with respect to pending actions including, among other things, customs actions, will not materially adversely affect the operations of the Company. ¶¶54, 68. This statement calls into question the Company's exposure to liability relating to customs violations. Further, because three of Kid Brands' four subsidiaries actively engaged in U.S. Customs violations at the time of the statement, the Company had a duty to disclose its exposure to upcoming actions related to such ongoing violations. *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 182 (S.D.N.Y. 2003).

Next, Defendants claim that statements relating to Kid Brands' strong financial position as a result of LaJobi sales during the Class Period somehow do not relate to customs duties. Clearly, all LaJobi sales during the Class Period were tainted with customs violations, and therefore the Company had a duty to disclose the wrongdoing that resulted in such substantial "cash flow" and higher net sales. ¶¶66, 64. Defendants cite *Galati v. Commerce Bancorp, Inc.*, No. Civ. 04-3252

(RBK), 2005 WL 3797764 (D.N.J. Nov. 7, 2005), for the proposition that Kid Brands' disclosures concerning sales and revenues derived from illegal conduct were not misleading. Co. Br. at 29. In *Galati*, plaintiffs brought a securities fraud action against Commerce Bancorp, Inc. and several of its executives and board members resulting from indictments stemming from bid-rigging, bribes, and other unlawful practices to secure contracts.   *Galati* at *1.   Plaintiffs alleged that financial figures in the company's balance sheet amounted to material misleading statements because the company secured contracts by engaging in illegal activity. *Id.* at *7. The Court in *Galati* disagreed, finding that empirical listings alone cannot create 10b-5 liability. *Id.*

In this case, however, Defendants' positive statements regarding Company growth directly attribute the success of the Company to LaJobi, while concealing that the Company's high earnings were based on illegal conduct: "Net sales for Q2 2010 increased 13.3% to $67.9 million, compared to $60.0 million for the three months ended June 30, 2009 ("Q2 2009"). ***This increase was primarily the result of strong growth at LaJobi.***" [emphasis added]. ¶64.  The Court's focus should be on the ability of the material to accurately inform rather than mislead prospective buyers. *McMahan & Co.*, 900 F.2d at 579; *Matrixx*, 131 S. Ct. at 1318 ("[T]he materiality requirement is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor

as having significantly altered the 'total mix' of information made available.'"
(citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *Local 731 I.B. of T.
Excavators and Pavers Pension Trust Fund v. Swanson*, No. 09-799, 2011 WL
2444675 at *8 (D. Del. June 14, 2011) "The 'total mix' standard requires a
'contextual inquiry' that is 'fact-specific.' (citing *Matrixx* at 1321). Furthermore, as
distinguished from Galati, Kid Brands was forced to disgorge approximately $7
million in earnings made as a result of skirting customs violations, therefore,
Defendants' statements including such earnings on LaJobi sales were decidedly
*not* accurate. ¶90. In fact, Defendants also acknowledged in its Amended 10-K/A
filed on May 2, 2011 that LaJobi and Kid Brands as a whole would have reached
performance targets but for the approximately $7 million owed to the U.S.
government as a result of anticipated antidumping duties. ¶83.  Clearly, the large
amount of duty repayment indicates a material omission that would have
significantly altered the mix of information investors relied upon because the owed
$7 million precluded Kid Brands and LaJobi from meeting their performance
targets for 2010.[7]

---

[7] Defendants also brazenly argue that the Complaint's allegations regarding federal
agency investigations into Kid Brands are fabricated because the Company merely
received an issued release to the industry as a whole.  Co. Br. at 30. Defendants
cite a Form 8-K filed on August 16, 2011 that supposedly indicates that the entire
industry received such notice. *Id.* at 30-31. The August 16, 2011 Form 8-K says no
such thing, and merely notes that the Company incurred costs to bring LaJobi cribs
into compliance with safety standards. Co. Ex. F. at 2.

## 2.      Defendants' Statements Cannot Be Dismissed As Puffery

Defendants contend that alleged material misstatements regarding Kid Brands' business model, brand strength, operational strengths, organizational synergy, stockholder benefits, working capital, and cost mitigation were mere puffery. Co. Br. at 27-28 (challenging statements in ¶¶52, 58, 74).[8] As an initial matter, "whether a particular statement is mere puffery or actionable misstatement must be determined by looking not only to the challenged language itself, but also the context in which the statement was made." *Rosen v. Textron*, 321 F.Supp. 2d 308, 320 (D.R.I. 2004). Accordingly, "factual disputes are not properly decided at this [motion to dismiss] stage of the proceedings." *In re Marsh & McLennan Co. Sec. Litig.*, 501 F. Supp. 2d 452, 474 (S.D.N.Y. 2006). Even at later stages, however, statements of corporate optimism are now viewed with disfavor and the "recent trend is to consider expressions of corporate optimism carefully." *See Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 250 (D. Mass. 2006) (citing authority and noting that the puffing concept has "gone the way of the dodo").

In executing their puffery attack, Defendants cherry-pick a handful of

---

[8] Defendants make no attempt to argue specifically why the statements contained within the cited paragraphs of the Complaint constitute puffery, other than pointing to two phrases in ¶52—"extending [its] leadership position" and seeking "synergies"—calling them "general, optimistic puffing" and "vague positive remarks accompanying earnings releases." Co. Br. at 28. But, such statements reflecting the overall economic health of the company are adequately pleaded as

statements wholly removed from the context in which they were made, and do not challenge the substantial majority of the statements in the allegedly offending paragraphs of the Complaint.   However, as Defendants themselves concede, context is crucial for analysis of whether a statement is actionable. Co. Br. at 28. Indeed, when Defendants' purported "puffed" statements are taken out of isolation, examined in their entirety, and placed in the context of a company boasting its success while concealing the illegal means by which it achieved such success, Defendants' statements clearly actionable material misstatements.

Defendant Crain's statements in the Company's March 29, 2010 release, taken as a whole and in the context of the Company's 2010 Growth Outlook, materially mislead investors regarding the operations and financial direction of Kid Brands.   Defendants point to the phrases, "extending leadership position" and "delivering synergies" as per se non-actionable in an attempt to categorically extrapolate all positive language under the ambit of "puffery." Co. Br. at 27.   The language of the release, when viewed in its entirety, boasts year-over-year growth for Kid Brands and emphasizes strong cash flows without mention of the illegal conduct that contributed to such liquidity.   In addition, the statement that Kid Brands "seek[s] to deliver synergies and benefits across the organization that should benefit all [its] stockholders" was plainly misleading because the

material to an investor and are actionable. *Morgan v. AXT, Inc.*, No. C 04-4362

synergistic platform used by Kid Brands to benefit the organization was a scheme whereby the subsidiaries boosted profits by circumventing customs duties.  This approach clearly did not benefit Kid Brands stockholders.

The other statements Defendants brand as puffery are adequately alleged to have misled investors as they relate to customs violations and the means by which Defendants mitigated costs in their business.  First, the Company stated that it "maintained discipline over variable costs and working capital while selectively investing in market share expansion." ¶58.  As alleged, Defendants drove down costs associated with its business, but did not exercise discipline in doing so. ¶11. As a result of the customs violations, Kid Brands saved millions of dollars in duty payments, which were later repaid to the government in addition to punitive costs. *Id.* Likewise, the statement that Kid Brands was "working closely with [its] vendor and retailer partners to mitigate rising costs of goods, and are maintaining tight controls on all discretionary expenses" also misled investors by not disclosing the illegal means by which the Company engaged in cost mitigation and expense control. ¶74. To that end, Defendants misled investors to "not anticipate meaningful additional debt repayment during the remainder of 2010," because duty repayment for customs violations would amount to millions of dollars. ¶74.

Defendants' argument that these statements are the type of "vague positive

---

MJJ, 2005 U.S. Dist. LEXIS 42346, at *30 (N.D. Cal. Sept. 23, 2005).

remarks that the Third Circuit has held to be non-actionable" is just not true.  In *Swanson*, the court held as actionable statements made by defendants regarding the strength and stability of the yellow pages market and identified reasons for the temporary nature of declines in revenue. *Swanson,* 2011 WL 2444675 at *1. In that case, the court reasoned that the statements were distinguishable from the "vague and general statement of optimism" because they addressed the source of decline in business, and therefore were the types of statements the reasonable investor would want to know and would rely upon. *Id*. at *10-11.  Similarly here, the statements directly bring into question the means by which Kid Brands was able to save money on expenses and drive profits, which was, namely, by skirting customs duties.  ¶¶ 52, 58, 74, 83.[9]

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss should be denied.[10]

Dated: January 9, 2012                    /s/ Jeffrey W. Herrmann

                                          Jeffrey W. Herrmann
                                          COHN LIFLAND PEARLMAN
                                          HERRMANN & KNOPF LLP

---

[9] Defendants argue that Plaintiffs have not adequately alleged Section 20(a) claims. If the primary violation of the securities law is pleaded with legal sufficiency, a plaintiff who pleads a §20(a) claim can withstand a motion to dismiss. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F. 3d 256, 286 (3d. Cir. 2006). Here, as described in detail above, Plaintiffs have pleaded their § 10(b) claims with legal sufficiency and thus secondary liability under § 20(a) is adequately pleaded.

[10] In the event that any portion of Plaintiff's complaint is dismissed, Plaintiff respectfully requests leave to amend pursuant to Fed. R. Civ. P. 15.

Park 80 West-Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Telephone: (201) 845-9600
Facsimile: (201) 845-9423

*Liaison Counsel for the Class*

Kim E. Miller
**KAHN SWICK & FOTI, LLC**
500 Fifth Avenue, Ste. 1810
New York, New York 10110
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com

*Lead Counsel for Lead Plaintiff and the
Class*