**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHAH RAHMAN, individually and an behalf of all others similarly situated, | Civil Action No.: 11-1624 (JLL) |
| Plaintiff, | **OPINION** |
| v. | |
| KID BRANDS, INC., et al., | |
| Defendants. | |

**LINARES, District Judge.**

This matter comes before the Court by way of motions to dismiss Plaintiff's Second Amended Complaint by Defendant Kid Brands, Inc. ("Kid Brands" or the "Company") and Raphael Benaroya ("Benaroya") (CM/ECF No. 51), Defendant Bruce Crain ("Crain") (CM/ECF No. 54), and Defendant Guy Paglinco ("Paglinco") (CM/ECF No. 53). This Court has considered the submissions in support of and in opposition to the motions and decides this matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the reasons set forth below, Defendants' motions are GRANTED.

## I. BACKGROUND

The Court will not set forth the factual background in great detail as it has already done so and presently writes only for the parties. Plaintiff Shah Rahman ("Plaintiff" or "Rahman") brings this putative class action under the Securities Exchange Act of 1934 (the "Securities Exchange Act") against Kid Brands and three of its executives: Defendant Crain, the Chief

Executive Officer of Kid Brands and a member of the Board of Directors during the class period (Compl. ¶ 26); Defendant Paglinco, who was during the class period and continues to be the Vice President and Chief Accounting Officer of the Company; and Defendant Benaroya who is not alleged to have been an interim executive until after the issuance of the relevant statements and even the class period.

Rahman alleges that Defendant Kid Brands perpetrated a scheme whereby it engaged in certain misconduct, which artificially inflated the value of its stock. Upon revelation of the misconduct, however, the value of stock significantly decreased and putative class member shareholders were harmed. (Second Amended Complaint ¶ 6) ("SAC"). Plaintiff characterizes said scheme as follows:

> Defendants inflated the value of the Company's stock by touting the Company's financial condition, operations, results, products, and compliance with applicable laws and regulations, while failing to disclose: 1) Kid Brands' violations of anti-dumping laws by avoiding import duties on the products LaJobi, CoCaLo, and Kids Line imported from China and elsewhere; 2) Kid Brands' product recalls, safety violations and the charges incurred related thereto; 3) Kid Brands' illegal staffing practices both domestically and overseas; and 4) weaknesses in the Company's internal controls.

(SAC ¶ 1).

Defendant Kid Brands allegedly designs, imports, markets and distributes branded infant and juvenile consumer products through its wholly owned subsidiaries Kids Line, LLC ("Kids Line"), Sassy, Inc. ("Sassy"), LaJobi Industries, Inc. ("LaJobi"), and CoCaLo, Inc. ("CoCaLo"). (SAC ¶ 7). As Kid Brands asserts and the SAC alleges, its products are manufactured primarily in China. (SAC ¶¶ 7, 25; Kid Brands Br. 13). With regard to those goods, Plaintiff alleges that "Kid Brands' business relies heavily on importing Chinese-manufactured products at bargain prices and selling them at increased prices in Western markets for a profit. These products, however, are subject to heavy

2

import duties as a result of 'anti-dumping' laws, which prevent foreign countries from inundating local markets with low-priced foreign goods with which domestic companies cannot compete." (SAC ¶ 10).

As per the Complaint, the United States assesses levees upon certain goods from other countries. (SAC ¶ 11). In some instances, levees vary by manufacturer. (SAC ¶ 11). United States Customs and Border Protection ("U.S. Customs") initiated a Focused Assessment regarding the importing practices of Kid Brands. (SAC ¶ 12).[1] Three months after receiving notice that it would be the subject of a Focused Assessment, on March 15, 2011, Kid Brands issued a press release in which it publicly disclosed certain wrongdoing at the LaJobi subsidiary. (SAC ¶ 103). Plaintiff alleges that as a result of the March 15, 2011 disclosure, Kid Brands' stock fell to a closing price of $6.91 from a closing price of $9.24 per share the day before. (SAC ¶ 15).

In the press release, Kid Brands announced the following: (1) its Board initiated an investigation which was overseen by a Special Committee and conducted by the firm Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"); (2) the investigation revealed that LaJobi violated U.S. Customs laws and employed illegal staffing practices that would result in approximately $7 million in anticipated charges and fines; and (3) the firing of two purportedly rogue employees to whom Kid Brands attributed wrongdoing at the LaJobi subsidiary. (SAC ¶ 103). Importantly, the press release disclosed the following conduct uncovered by the investigation:

> instances at LaJobi in which incorrect import duties were applied on certain wood furniture imported from vendors in China, resulting in a violation of anti-dumping regulations. On the basis of the investigation, the Board concluded that there was

---

[1] Plaintiff explains that "U.S. Customs polices importers much in the same way the SEC polices companies vís-a-vís financial disclosure, and will audit companies under its 'Focused Assessment Program' which it determines are involved in questionable importing behavior." (Pl. Opp'n. 6; Compl. ¶ 12).

3

> misconduct involved on the part of certain LaJobi employees in connection with the incorrect payment of duties, including misidentifying the manufacturer and shipper of products. The ongoing investigation is also focusing on certain of LaJobi's business and staffing practices in Asia.

(SAC ¶103).

Plaintiff additionally alleges that Kid Brands filed a number of statements subsequent to the March 15, 2011 press release, which contained misleading statements and omissions regarding:

> 1) Kid Brands' violations of anti-dumping laws by avoiding import duties on the products LaJobi, CoCaLo, and Kids Line imported from China and elsewhere; 2) Kid Brands' product recalls, safety violations and the charges incurred therefrom; 3) Kid Brands' illegal staffing practices both domestically and overseas; and 4) the purported accuracy and effectiveness of the Company's internal disclosure controls.

(SAC ¶ 66).

On August 15, 2011, Plaintiff alleges that Kid Brands issued a Form 10-Q for the quarter ending on June 30, 2011, which disclosed the breadth of wrongdoing at the Company and at the non-LaJobi operating subsidiaries. (SAC ¶ 17). As a result, Kid Brands stock fell to a closing price of $3.65 per share compared to $4.49 the day before and eventually to $2.97 per share on August 22, 2011. (SAC ¶ 19).

As to the voluntary steps allegedly taken by Kid Brands, Plaintiff asserts that "[t]his self-adulation rings hollow in light of the well-pleaded allegations of the SAC that Defendants, including CEO Bruce Crain and CFO Guy Paglinco, were actively engaged in a pattern and practice of customs violations at multiple subsidiaries in order to materially improve their financial bottom line." (Pl. Opp'n. 5-6). Specifically, Plaintiff submits that "six former employees of the Company attested to a pattern of violations of customs laws, non-compliance with Sarbanes Oxley Act requirements, and inaccurate

data that pervaded the Company's entire business practice and resulted in favorable, but wrong profit data." (Pl. Opp'n. 7).

The alleged customs violations entail re-labeling products to reflect a different country of origin in order to lower Kid Brands' import duties. (Compl. ¶ 38). Notably, however, the corrective disclosures made by Kid Brands involve misidentifying the Chinese manufacturer of certain goods which originated in that country, not misidentification of the country of origin. As a result of said alleged practices, Kid Brands' stock allegedly traded at artificially high levels until the disclosure on March 15, 2011 and August 15, 2011. (SAC ¶¶ 15, 19, 105, 128).

On March 8, 2012, this Court dismissed Plaintiff's First Amended Complaint. (CM/ECF No. 44). Specifically, the Court found that the First Amended Complaint did not satisfy the heightened scienter pleading requirements of the PSLRA as to Kid Brands or either of the individually named executives. As a result, the Court also found dismissal of Count II warranted because the viability of Plaintiff's control person liability theory as to Defendants Crain and Paglinco was contingent upon the success of Plaintiff's Section 10(b) claim. (CM/ECF No. 44, 14).

With regard to Defendants' failure to disclose material facts regarding U.S. Customs violations and government investigations, the Court did, however, find that there was a substantial likelihood that the disclosure of the omitted facts regarding U.S. Customs violations by three out of four of Kid Brands' subsidiaries would have been viewed by a reasonable investor as significantly altering the "total mix" of information available to him or her. Accepting as true the underlying allegations that Defendants

misclassified products so as to avoid paying higher customs duties, the earnings reported in Defendants' SEC disclosures were inflated to the extent that they did not accurately portray the company's actual costs as calculated in accordance with the company's compliance with federal law. (CM/ECF No. 44, 16-17). The Court continued that the timing of the LaJobi disclosure in March 2011 was not misleading, particularly in light of Defendants' efforts to investigate the matter through an independent law firm and the practical considerations regarding the timing of the disclosures. Id. at 18. However, Plaintiff adequately pled that the delayed disclosure in August 2011 regarding CoCaLo and Kids Line was sufficiently misleading, and such could be found material by a jury. Id. at 18.

As to statements regarding the financial health of the company and customs compliance and internal controls, the Court held that "if customs violations were in fact so pervasive as to have been occurring in three out of four of Kid Brands' subsidiaries, statements regarding the company's limited scope of liability, the effectiveness and sufficiency of the company's internal controls and procedures, and the discontinuation of practices that rested in anti-dumping liability are material as there is a substantial likelihood that a reasonable investor would deem such information significant in the total mix of information available to him or her." Id. at 23.

In the SAC, Plaintiff asserts the following causes of action: (1) violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder as to all Defendants; and (2) violation of Section 20(a) of the Securities Exchange Act against the Individual Defendants. It also bears noting at the outset that in addition to

6

naming Crain and Paglinco as individual defendants, Plaintiff's Second Amended

Complaint adds allegations against Defendant Raphael Benaroya ("Benaroya"), the

Chairman of the Board and Director of Kid Brands (collectively "Individual

Defendants"). As of September 2011, Plaintiff alleges that in addition to serving as

Chairman of the Board, Benaroya has been the interim Executive Chairman during the

pendency of the search for a new chief executive. (SAC ¶ 28).


## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that a Complaint set forth "a short

and plain statement of the claim showing that the pleader is entitled to relief." Fed. R.

Civ. P 8(a)(2). The plaintiff's short and plain statement of the claim must "give the

defendants fair notice of what the . . . claim is and the grounds upon which it rests."

Twombly at 545 (quoting Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80

(1957)). For a complaint to survive dismissal, it "must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal,

129 S. Ct. 1937, 1949 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127

S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

In evaluating the sufficiency of a complaint, a court must accept all well-pleaded

factual allegations in the complaint as true and draw all reasonable inferences in favor of

the non-moving party. Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir.

2008). "Factual allegations must be enough to raise a right to relief above the speculative

level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Further, "[a] pleading

that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 557 (2007)); Evancho v. Fisher, 423 F.3d 347, 350 (3d Cir. 2005) ("[A] Court need not credit either 'bald assertions' or 'legal conclusions' in a complaint when deciding a motion to dismiss.").

In addition, as this case involves claims for securities fraud, Plaintiff must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). Rule 9(b) provides, in relevant part, as follows: "In alleging fraud . . ., a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Thus, at a minimum, "plaintiffs [must] support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of a newspaper story' – that is, the 'who, what, when, where and how' of the events at issue." In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 147 (3d Cir. 2004) (citation omitted).

Similarly, as per the PSLRA, a plaintiff must satisfy heightened pleading requirements and "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313, 321 (2007) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, and n.12 (1976), and citing 15 U.S.C. § 78u-4(b)(1), (2)). First, with regard to misleading statements and omissions of material fact, a plaintiff must "specify each statement alleged to have been misleading,

8

the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omissions is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Further, the statement must have been misleading at the time it was made, as "liability cannot be imposed on the basis of subsequent events." In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1330 (3d Cir. 2002).

As to scienter, the second requirement, "each act or omission alleged to violate [Section 10(b)], [a plaintiff must] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).[2] In evaluating whether a complaint meets this requirement, a court is required to consider inferences urged by the plaintiff as well as "competing inferences rationally drawn from the facts alleged." Tellabs, 551 U.S. at 314. A "strong" inference is "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent . . . . The inference . . . need not be refutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" Id. at 314, 324. The Third Circuit permits a plaintiff to satisfy this requirement with allegations of strong circumstantial evidence of either conscious behavior or recklessness. S.E.C. v. Infinity Grp., Inc., 212 F.3d 180, 192 (3d Cir. 2000); see also In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534-35 (3d Cir. 1999). In this context, recklessness is "highly unreasonable [conduct], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, . . . which

---

[2] As the Court explained in its previous Opinion, to the extent that the PSLRA's scienter pleading requirements conflict with those of Federal Rule of Civil Procedure 9(b), the PSLRA supersedes the latter as it relates to Rule 10b-5 actions. See Institutional Investors Grp. v. Avaya, Inc., 564 F.3d 242, 253 (3d Cir. 2009); see also Alpharma, 372 F.3d at 148.

presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." S.E.C. v. The Infinity Grp., Co., 212 F.3d at 192.  Finally, a court considers the entirety of a complaint in determining "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets this standard." Tellabs I, 551 U.S. at 322; see also Institutional Investors Grp. v. Avaya, Inc., 564 F.3d 242, 273 (3d Cir. 2009).

## III. DISCUSSION

### A. Section 10(b)

Section 10(b) of the Securities Exchange Act forbids the "use or employ, in connection with the purchase or sale of any security . . ., [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).  Under Rule 10b-5 promulgated thereunder, the following is unlawful when done in connection with the purchase or sale of any security:

(a) To employ any device, scheme, or article to defraud

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person . . . .

17 CFR § 240.10b-5.

In order to state a claim for securities fraud under Section 10(b) of the Securities Exchange Act and Rule 10b-5, a plaintiff must allege the following: (1) that defendants

10

made a misstatement or an omission of material fact; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) upon which the plaintiff reasonably relied; and (5) plaintiff's reliance was the proximate cause of the injury. Avaya, 564 F.3d at 251. The elements presently in dispute are loss causation and scienter.

As to the former, Defendant Kid Brands argues that as Plaintiff does not and cannot point to a corrective public disclosure relating to the newly alleged fraud, Plaintiff does not plead loss causation. (Kid Brands Br. 10-11). Rahman urges that the mis-identification disclosures encompass his re-labeling allegations, and that even though there is no corrective public disclosure as to the recall allegations, they relate back to the previous misstatements by Defendants. (Pl. Opp'n. 53). However, as the Court finds that Plaintiff does not satisfy the heightened scienter pleading requirements under the PSLRA and that dismissal is warranted on that basis, it will not address the loss causation arguments.

## 1. Scienter

"Scienter is a 'mental state embracing intent to deceive, manipulate, or defraud,' and requires a knowing or reckless state of mind." Avaya, 564 F.3d at 252 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n. 12 (1976) and citing In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534-35 (3d Cir. 1999)). As the Third Circuit has held, in the securities context recklessness includes:

> [H]ighly unreasonable (conduct), involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either knowing to the defendant or is so obvious that the actor must have been aware of it.

U.S. S.E.C. v. Infinity Grp., Co., 212 F.3d 180, 192 (3d Cir. 2000).

11

As explained above, "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. 324. Therefore, as per the PSLRA, Plaintiff may not plead scienter generally as would be the case under Federal Rule of Civil Procedure 9(b); rather, as Rahman alleges false or misleading statements, he must "state with particularity facts giving rise to a strong inference that the [Defendants] acted with the required state of mind." Avaya, 564 F.3d at 253 (quoting Tellabs, 551 U.S. at 308).

Defendant Kid Brands argues that the Complaint, as amended, is insufficient and contains only three changes: (1) a new theory regarding the re-labeling and obscuring of "Made in China" labels that is "neither coherent nor compelling and bears no connection to the voluntarily disclosed customs violations at the Company's subsidiaries or Kid Brands' public statements on that subject"; (2) "throw in baseless accusations from an uncorroborated, anonymous source about the selling of re-called products," which Defendants contend has nothing to do with Plaintiff's alleged losses; (3) the addition of Defendant Raphael Benaroya who "was an outside director of the Company who is not alleged to have served as interim Chief Executive Officer until September 2011 - well after the discovery and disclosures of the discrete and unrelated customs violations and after the end of the putative class period." (Kid Brands Br. 4-7).

12

a. Confidential Witnesses

In a securities fraud action, a plaintiff can use confidential sources to support a complaint under the following circumstances:

> (1) if the complaint sets forth other factual allegations, such as documentary evidence, which are sufficient alone to support a fraud allegation, or (2) when the confidential sources are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the [confidential] source would possess the information alleged.

Intelligroup, 527 F. Supp.2d at 290 (internal citations omitted).  As explained in the Court's previous Opinion, "[a]llegations sourced in confidential witnesses may support the scienter showing under the PSLRA, and 'there is no requirement that [said witnesses] be named, provided they are described . . . with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" (CM/ECF No. 44, 25) (quoting Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 146 (3d Cir. 2004)).  Thus, in determining the sufficiency of allegations made by confidential sources, a court should evaluate the "'detail provided by the confidential sources, the sources' bases of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia.'  If anonymous source allegations are found wanting with respect to these criteria, then we must discount them steeply." Avaya, 564 F.3d at 263 (quoting Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp., 394 F.3d 126, 147 (3d Cir. 2004)); Nat'l Jr. Baseball League v. Pharmanet Dev. Grp., Inc., 720 F. Supp. 2d 517, 538-39 (D.N.J. 2010).  For the reasons set forth below, the Court finds that discounting the confidential witness allegations in the SAC is warranted here.

Defendant Kid Brands characterizes the CW allegations in the SAC as "essentially parrot[ing] the same CW allegations from the [First Amended Complaint] that were already explicitly rejected by this Court." (Kid Brands Br. 8). Kid Brands further urges that "[a]s the Third Circuit made clear in <u>Chubb</u>, '[t]he sheer volume of confidential sources cited cannot compensate for [pleading] inadequacies' and '[c]obbling together a litany of inadequate allegations does not render those allegations particularized in accordance with Rule 9(b) or the PSLRA." (Kid Brands Br. 22) (quoting <u>Chubb</u>, 394 F.3d at 155). On the other hand, Plaintiff submits that "[t]he SAC further shows that six former employees of the Company attested to a pattern of violations of customs laws, non-compliance with Sarbanes Oxley Act requirements, and inaccurate data that pervaded the Company's entire business practice and resulted in favorable, but wrong profit data. (Pl. Opp'n. 7; Compl. ¶¶ 31-55).

The Complaint presently before the Court contains allegations set forth by six confidential witnesses ("CWs").[3] As characterized by Plaintiff,

> [t]he allegations from [the three CWs added upon amendment] include, *inter alia*, that it was their direct responsibility to misleadingly 're-label' or obscure country of origin labels in contravention of U.S. Customs laws, and that Defendants Crain and Paglinco had a hand in orchestrating the scheme by which LaJobi would circumvent U.S. Customs duties or, at the very least, that they were aware of the scheme. These are not unsubstantiated, vague allegations but instead are specific, fully corroborated eyewitness accounts demonstrating Kid Brands and its executives, in collaboration with the Company's subsidiaries, actively engaged in a scheme to avoid U.S. Customs Duties.

(Pl. Opp'n. 15) (citations omitted).

The Court will first assess whether the CW allegations are sufficient to satisfy <u>Chubb</u> and <u>Avaya</u> criteria beginning with those regarding the LaJobi subsidiary. The

---

[3] The Court notes for the sake of completeness that Defendant submits that "CW3" and "CW5" in the Complaint presently before the Court were identified as "CW1" and "CW3" in the previous complaint. (Kid Brands Br. 28).

14

allegations stemming from the alleged practices at LaJobi involve a re-labeling scheme and the resale of recalled products. The Court will address each in turn.

CW1 is a former LaJobi employee who worked in the Outbound Shipping Department from March 2010 until March 2012. The SAC states that "CW1's statements are based upon his personal daily experiences and observations working in the Outbound Shipping Department where it was his job to know the details of exactly which products were received and what products were shipped out on a daily basis." (SAC ¶ 31). In addition, "CW1 physically handled the products that came into and left the distribution center." Id. CW 2 is a former LaJobi employee who worked in the Receiving and Shipping Department from June 2011 through January 2012. Plaintiff alleges that "CW2's statements concern his/her daily employment at LaJobi personally handling inbound and outbound shipments of products and personally observing interactions of management." (SAC ¶ 32).

CW1 and CW2 were personally responsible for "taking 'furniture that had been purchased and shipped from China and 're-label[ing]' the furniture and boxes by attaching white stickers with a different country of origin.'" (Pl. Opp'n. 16; Compl. ¶ 38-39). Both were low-level employees who reported to a manager named Brenda and/or Myles McGrath ("McGrath"), Director of Operations. (Compl. ¶¶ 31, 32). McGrath reported to Larry Bivona, the former President of LaJobi and one of the two purportedly rogue employees fired as one of the remedial steps taken in connection with the customs violations at LaJobi. (Compl. ¶ 31). In addition, "[a]ccording to CW2, McGrath and Brenda conferred with the CEO and CFO regarding the protocol for affixing false

15

country of origin labels.  Ordinarily, Brenda kept the labels in her office, but when the CEO and CFO arrived to meet with McGrath and Brenda, the meetings would take place in McGrath's office and the labels were moved into McGrath's office for the meetings." (Compl. ¶ 40).  However, CW2 was not employed at LaJobi until June 2011, which Kid Brands stresses was "well <u>after</u> Kid Brands had already received the notice of the impending Focused Assessment, investigated the customs issues, voluntarily disclosed them to U.S. Customs, the SEC, and the public, and took remedial steps by, among other things, terminating responsible LaJobi employees."  (Kid Brands Br. 24) (emphasis in original).  In addition, Defendants submit that CW2 does not identify the "CEO and CFO" as Crain and Paglinco, respectively.

As this Court previously explained, the complaint must describe "the duration of each [confidential witnesses'] employment, the time period which the [witness] acquired the relevant information, and how each [witness] had access to such information." (CM/ECF No. 44, 25) (quoting <u>Avaya</u>, 564 F.3d at 263).  The Court agrees with Defendants that the allegations regarding customs violations by CW 1 and CW2 are deficient under <u>Avaya</u> and <u>Chubb</u>.  Here, CWs 1 and 2 generally allege that they obtained access to the relevant information through handling boxes and their re-labeling of said boxes.  They do not, however, adequately set forth the basis of their alleged knowledge related to the meetings with Company executives or the Customs practices of the Company.  CW2's allegations regarding meetings with executives are that the "the Kid Brands CEO and CFO," whom CW2 does not specifically identify, toured the facility and met with Brenda and McGrath "approximately every other month."  (SAC ¶ 40).  While

16

Plaintiff alleges that "[a]ccording to CW2, McGrath and Brenda conferred with the CEO and CFO regarding the protocol for affixing false country of origin labels," CW2 does not allege firsthand knowledge of what went on during said meetings nor does he or she set forth the basis for this assertion. (SAC ¶ 40). Rather, CW2 merely asserts that the labels would be moved into McGrath's office, where the meetings were held, from Brenda's office, where the labels were usually stored. (SAC ¶ 40).

Defendant Kid Brands submits that the allegations concerning CW3, a former Distribution Manager at LaJobi, and CW5, a former Sales and Forecast Demand Manager at LaJobi, are virtually identical to those in the previous complaint despite the facts that Plaintiff changed their descriptive moniker. (Kid Brands Br. 28). CW3 was a Distribution Manager at LaJobi from May 2000 through November 2010 whose duties included  overseeing warehouse safety and security as well as outgoing shipping and incoming inventory. (SAC ¶ 33). CW3 also reported to Myles McGrath.  The Court agrees that the allegations put forth by CW3 in the SAC continue to be deficient for largely the same reasons, namely, the insufficiency of vague allegations such as "rumors that things weren't on the up and up" and a "strange feeling that things weren't right." (SAC ¶ 42). CW5 was a Sales and Forecast Demand Manager at LaJobi from March 2010 to April 2011. (SAC ¶ 35). CW5's responsibilities included "developing a forecast of the products that LaJobi expected to sell in the future so that procurement decisions could then be made on this anticipated demand." (SAC ¶ 35). CW5 reported to Linda Hennessy who, in turn, reported to Myles McGrath. The SAC provides that "CW5's statements are made with personal knowledge and familiarity of LaJobi's operations,

17

database and inventory tools from his/her daily employment." (SAC ¶ 35).  CW5 generally alleges that he or she "recalled seeing Kid Brands Senior Vice President Mark Goldfarb and Defendant CEO Bruce Crain from time to time on the LaJobi premises" and that "[d]uring these visits, CW5 explained that Goldfarb and Crain would often meet with Bivona," the former President of LaJobi and one of the two purportedly rogue employees fired in connection with the customs violations.  (SAC ¶ 41).

With regard to the recall allegations put forth by CW1, Defendant Kid Brands submits that "[t]here are no dates or details about when these products were allegedly resold.  Other than to conclusorily state that he had first hand [sic] knowledge, CW1 does not explain any details as to how he obtained this information as an employee at the Outbound Shipping Department or what basis he has for assessing whether children's furniture is compliant with safety regulations." (Kid Brands Br. 30-31).  The Court agrees that the sole allegations by CW1 relating to product-recall allegations are insufficient.  Those allegations involve CW1's opinion that "the furniture that the Company was selling was trash" and, without more, that LaJobi continued to order a crib which was allegedly "recalled for safety issues." (Compl. ¶ 44).  Therefore, the recall allegations are not pled with the requisite particularity and the Court discounts those allegations by CW1 accordingly.  See Avaya, 564 F.3d at 263.

The Court now turns to the remaining subsidiaries, CoCaLo, Sassy, and Kids Line.  Notably, there is no CW from the CoCaLo subsidiary, which is headquartered in Irvine, California.  (Kid Brands Br. 23; Compl. ¶¶ 31-36).  Nor is there a confidential witness for the alleged continued sale of recalled products at Sassy, headquartered in

18

Michigan. (Kid Brands Br. 30). The only confidential witness who makes allegations regarding Kids Line is CW6, a former "packaging designer" who was employed from June 2011 to March 2011. He or she was allegedly terminated from Kids Line and allegedly sued that subsidiary for not "honor[ing] his employment contract." (SAC ¶¶ 36, 50). CW6 alleges that the circumstances of the termination are based upon personal knowledge. (SAC ¶ 36). The SAC does not provide additional information or allegations, including the date of the termination or the basis for the suit and underlying belief that Kids Line did not honor the employment contract.

Finally, CW 4 is a former Russ Berrie/Kid Brands employee who worked as a Sarbanes Oxley Compliance Consultant in the International Auditing Department of the Company from March 2004 to August 2009. (SAC ¶ 34).[4] The SAC alleges that "CW4's knowledge of Kid Brands financial reporting practices comes from first-hand experience in reviewing Kid Brands' and all of the subsidiaries' financial information." (SAC ¶ 34). In CW4's experience, "LaJobi had been 'singularly uncooperative in complying with Sarbanes Oxley requirements.'" (SAC ¶ 52). Without more, this vague and conclusory assertion does not comport with the confidential witness requirements. Accordingly, upon consideration of the criteria set forth in <u>Chubb</u> and <u>Avaya</u> as applied to the allegations set forth by the confidential witnesses and the bases therefore, the Court finds discounting said allegations warranted here.

---

[4] The SAC alleges that originally Kid Brands dealt in global gift products under the name Russ Berrie and Company, but in or around 2002 the Company acquired four companies already involved in the infant and juvenile markets and began focusing exclusively on child products. (SAC ¶ 9).

b. Collective and Individual Scienter

As delineated above, Plaintiff asserts that Kid Brands through its executives engaged in four types of wrongdoing which artificially inflated the value of the Company's stock and made its public disclosures materially misleading: 1) re-labeling imported products to reflect a different country of origin at the LaJobi facility; 2) reselling recalled furniture; 3) illegal staffing practices in Asia and the United States; and 4) violations of the Sarbanes-Oxley Act.[5] The Court will address whether Plaintiff satisfies the PSLRA's scienter pleading requirements and pleads particularized facts sufficient to give rise to a strong inference that any Defendant acted with the requisite fraudulent intent when making the statements at issue. See Winer Family Trust v. Queen, 503 F.3d 319, 326 (3d Cir. 2007). As explained below, however, the Court finds that SAC does not support a strong inference that any of the Individual Defendants acted with a culpable state of mind. In addition, the Court finds that collective scienter is inapplicable to the facts as alleged.

The Court first turns to the alleged re-labeling at the LaJobi facility. Defendants argue that Plaintiff's re-labeling theory is not cogent. Defendant Paglinco submits that "[i]t is . . . simply unrealistic and implausible that senior management of LaJobi's parent Company would be discussing in some culpable way 'the protocol for affixing false country of origin labels' on LaJobi's products, after LaJobi's import practices had been the subject of a U.S. Customs focused assessment, and investigated by the Company's

---

[5] The Court will not address the alleged Sarbanes-Oxley Act violations because they are primarily based on the allegations of CW4 which are impermissibly vague and should be steeply discounted. Nat'l Junior Baseball League v. Pharmanet Dev. Grp., Inc., 720 F. Supp. 2d 517, 539 (D.N.J. Mar. 30, 2010) ("Where these requirements are not met, courts must ignore the insufficiently described witness' statements for purposes of evaluating the plaintiff's allegations.")

20

law firm, and when the Company already had publicly announced LaJobi's Customs violations." (Def. Paglinco Br. 12). Similarly, Defendant Crain argues "[t]hat the purported 'labeling' activity is alleged to have occurred during the period <u>after</u> the Company had already identified, investigated, self-reported and rectified certain customs violations further confirms the implausibility of the Plaintiff's claims." (Def. Crain Br. 2) (emphasis in original).

Kid Brands argues that it is "nonsensical and based on a misunderstanding of anti-dumping laws and LaJobi's disclosed violations." (Kid Brands Br. 5). In essence, the Company argues, that because the facts alleged do not concern assessment of anti-dumping duties after the port of entry, which Kid Brands submits is typical for imported goods, re-labeling at LaJobi facility in Cranbury, New Jersey thereafter does not demonstrate attempted circumvention of the relevant duties. <u>Id.</u> In addition, "there is nothing in the Company's disclosures or any factual support in the SAC that the customs violations at LaJobi had anything to do with alleged 'labels' that misrepresented the country of origin; rather, as disclosed, LaJobi's customs issues involved 'misidentifying' on customs forms the manufacturer in China and, thereby, being assessed a lower anti-dumping rate." <u>Id.</u> at 6.

Plaintiff counters that the customs process has moved away from regulation of the entry of goods before they reach the stream of commerce to an "automatic bypass" system which may involve reliance upon declarations and post import audits to ensure the integrity of the process. (Pl. Opp'n. 19) (citing <u>United States v. Rockwell Automation, Inc.</u>, 30 C.I.T. 1552, 1553 (2006)). Thus, Plaintiff urges that Defendants' argument is

21

nothing more than a red herring, as "re-labeling the products thereafter could directly

serve the purpose of continuing the circumvention of U.S. Customs Duties, such as at a

post-import audit." Id. at 19-20.

In any event, Kid Brands asserts that "CW2 and CW1 make insufficiently vague

allegations," particularly in light of the facts that Plaintiff does not specify what was on

the relevant labels nor tie the re-labeling to the customs issues that the Company

investigated and disclosed. (Kid Brands Br. 9-10). Specifically,

> CW1 and CW2 are not alleged to have been involved in any way with LaJobi's reporting
> to U.S. Customs, to have had any information about LaJobi's customs reporting process,
> to have had personal knowledge about filing sophisticated customs reports or to have had
> any knowledge as to the self-initiated investigation which found that LaJobi was paying
> "incorrect" anti-dumping duties based on incorrect entries and invoices. Furthermore,
> CW1 and CW2 are not alleged to have worked with, spoken to or met with any of the
> Individual Defendants or anyone at the Company through whom scienter could be
> imputed.

(Kid Brands Br. 25).

Further, the allegations regarding the labeling practices are uncorroborated and do

not include sufficient information about what was on the labels or that the labels at issue

related to disclosed customs violations, namely incorrect dumping duties. (Kid Brands

Br. 29). Finally, CW 1 describes white labels with a different country of origin. (SAC ¶

38), whereas CW 2 describes "yellow and white labels (white labels on two sides and

yellow on the short side), which would obscure the 'Made in China' labels," but does not

allege that the latter contained a different country of origin. (SAC ¶ 39).

Even putting aside Kid Brands' argument that re-labeling after the port of entry is

inconsistent with customs violations generally, it is unclear how the allegations of

obscuring made-in-China labels demonstrate violations in this case where the company

openly discloses that its products are primarily made in China. (Compl. ¶ 25). The Court

22

agrees Plaintiff does not connect the alleged re-labeling practices to the customs violations at issue at LaJobi, which concerned identifying the incorrect manufacturer within China, not the country of origin.  In addition, none of the CWs allege any familiarity with LaJobi's process for reporting goods to U.S. Customs or access to the relevant customs reports.  As was the case with the First Amended Complaint, the omissions and ambiguities pointed to by Kid Brands "count against inferring scienter." Tellabs, 551 U.S. at 326 (2007).

Further, the confidential witness whose allegations relate to the meetings, CW2, was allegedly employed from June 2011 to January 2012.  (SAC ¶ 40).  Accordingly, the newly included allegations do not shed any light on what, if anything, Company executives knew or recklessly disregarded before the March 15, 2011 disclosures.  With regard to the alleged post-March 15, 2011 wrongdoing, as Defendant Paglinco argues, CW2 alleges that meetings occurred "every other month," but they "could even have occurred (if at all) after the disclosures on August 15 and 16, 2011 (that discussed practices at other subsidiaries where CW2 did not work), outside the class period." (Def. Paglinco Br. 10).  Also, Defendant Crain submits, in part, that "it is nonsensical to conclude that the Company's senior management would be involved in any activity that would further contribute" to the violations voluntarily disclosed on March 15, 2011 thereafter.  (Def. Crain Br. 12).

Despite the limited allegations concerning the remaining subsidiaries, Plaintiff argues that "the statements from CW1, CW2, CW3, and CW5 implicating the Defendants Crain and Paglinco, when coupled with the fact that the same illegal conduct occurring at

LaJobi had also been occurring at CoCaLo and Kids Line for approximately two years prior to the acquisition of LaJobi, strongly support the inference that the Individual Defendants were directly responsible for or at least aware of the same U.S. Customs violations also occurring at CoCaLo and Kids Line." (Pl. Opp'n. 29-30). Plaintiff also contends that the new allegations strongly support the inference that the Individual Defendants were at least aware of the violations occurring at the other subsidiaries, particularly in light of the fact that "the illegal activities at CoCaLo and Kids Line preceded the acquisition of LaJobi by approximately two years." (Pl. Opp'n. 32-33).

Importantly, as to the Individual Defendants, Plaintiff primarily relies on Crain and Paglinco's positions within the Company and that they attended meetings at the LaJobi facility in Cranbury, New Jersey. Without more, however, the Individual Defendants respective positions within the Company are insufficient to satisfy the scienter requirement. McGowan Investors, LP v. Frucher, 481 F. Supp. 2d 405, 417-18 (E.D.Pa. 2007) aff'd, 392 F. App'x 39 (3d Cir. 2010); In re Nice Sys. Ltd. Sec. Litig., 135 F. Supp. 2d 551, 587 (D.N.J. 2001).

The Court finds that Plaintiff Rahman fails to articulate factual allegations that constitute strong circumstantial evident of conscious misbehavior or recklessness at the LaJobi facility or other subsidiaries. A holistic assessment of the re-labeling allegations at LaJobi accepted as true demonstrates what confidential witnesses describe as pattern and practice of using certain labels on boxes, some which were yellow and white and others with a country of origin other than China. Although the labels were allegedly

moved into the office where meetings with executives took place, the subject of said meetings and other important details are unknown.

Plaintiff Rahman offers no document or factual source other than confidential witnesses. None allege that they worked with any of the Individual Defendants, participated in any meetings with executives regarding customs issues, or had any firsthand knowledge of what happened in said meetings. As was previously the case, the SAC does not clearly delineate the alleged knowledge either Defendant Crain or Paglinco possessed with regard to customs violations or other alleged wrongdoing based on either their respective positions within the Company or otherwise. Nor does Plaintiff allege a departure from the standard of ordinary care to the extent that it was so obvious that the actor must have been aware. U.S. S.E.C. v. Infinity Grp. Co., 212 F.3d 180, 192 (3d Cir. 2000). Thus, upon a holistic consideration of the re-labeling allegations contained in the SAC, the Court finds that a reasonable person would not deem the inference of scienter at least as strong as any opposing inference. See Tellabs, 551 U.S. at 326, 329.

For the reasons set forth below, the Court finds the remaining allegations of wrongdoing wholly deficient under the pleading requirements of the PSLRA on account of their overall lack of particularity. First, the alleged product recall and safety practices include the allegations from CW1 discussed above and the general assertion that the Sassy subsidiary sold an unsafe product, which was discontinued. (SAC ¶¶ 44-46). As explained previously, steeply discounting the recall allegations of CW1 for failure to meet the requisite confidential witness criteria is warranted here. To the extent that the remaining vague and conclusory allegations constitute assertions of wrongdoing, the

25

SAC does not suggest that any of the Individual Defendants had any involvement with or knowledge of these practices which would allow the Court to draw a strong inference that any acted with the requisite fraudulent intent. See Winer Family Trust, 503 F.3d at 326. Nor do these conclusory allegations adequately show an extreme departure from the standard of ordinary care that is so obvious that the actor must have been aware. See Infinity Group Co., 212 F.3d at 192.

As to the alleged illegal staffing practices, Plaintiff points to services provided by L&J industries under a service agreement with the Company as well as terminations at unspecified subsidiaries domestically. (SAC ¶¶ 47-50). Aside from excerpts from the Kid Brands Form 10-Q for the quarter which ended in June 30, 2011, the SAC generally provides, in relevant part, that "L&J inspectors were on the Kid Brands payroll, therefore Defendants concealed that their employees were 1) being paid illegally; and 2) that the Company was avoiding necessary benefit payments, thereby illegally improving the Company's bottom line." (SAC ¶ 49). However, Plaintiff's broad assertions do not sufficiently allege that any of the Individual Defendants had any involvement with or knowledge of said staffing and employment practices in Asia. Nor does Plaintiff provide enough detailed factual allegations which could support a finding that the illegal staffing practices were so pervasive that the Individual Defendants must have been aware.

With regard to the allegations involving United States subsidiaries, Plaintiff merely alleges that: "In addition, many employees at Kid Brands subsidiaries were terminated without cause, likely adding to the list of illegal staffing practices. For example, CW1, CW2, and CW3 were all terminated from their positions at LaJobi

26

without explanation." (SAC ¶ 50). Also alleged is that CW3 and CW6 filed suit. Id. Plaintiff does not provide sufficient information to determine whether the allegations could constitute wrongdoing, such as whether said employees were at will and the basis for or disposition of the employment related suits. Nor does Plaintiff allege any involvement by the Individual Defendants or knowledge of the terminations and allegedly related suits. Accordingly, the general and conclusory allegations set forth in the SAC do not support a strong inference of scienter with regard to illegal staffing practices by the Company domestically or abroad because they are not pled with the detail required under the PSLRA.

Furthermore, while not fatal to Plaintiff's claim in and of itself, the SAC does not allege any facts which would suggest motive or opportunity on the part of the Individual Defendants to engage in securities fraud. As the Court previously explained, while "'motive and opportunity' may 'no longer serve as an independent route to scienter,' 'they are to be considered along with all the other allegations in the complaint. . . .'" (CM/ECF No. 44, 42-43) (quoting Avaya, 564 F.3d at 277-78). Here, the lack of motive allegations here bolsters the Court's finding of an overall lack of support necessary to establish a strong inference of a culpable state of mind.

Finally, as explained previously, to the extent that collective scienter is viable in the Third Circuit, the Court finds the facts alleged are not akin to those extraordinary scenarios cited in City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc., 442 Fed. Appx. 672, 676 (3d Cir. 2011) and discussed more fully in the Opinion dismissing the

27

First Amended Complaint. (CM/ECF No. 44, 36). Plaintiff submits that the doctrine is applicable in light of the re-labeling allegations and that

> three of four Kid Brands' wholly owned subsidiaries were participating in the same type of illegal activities occurring at LaJobi, the new allegations strongly support the inference that the Individual Defendants were also at least aware of or at most directing the same wrongdoing occurring at CoCaLo and Kids Line. This is further supported by the fact that the illegal activities at CoCaLo and Kids Line preceded the acquisition of LaJobi by approximately two years.

(Pl. Opp'n. 33). Thus, in essence, Plaintiff primarily relies on the same SAC confidential witness allegations that the Court deemed deficient and facts already considered insufficient by the Court:

> In sum, considering the sheer significance of LaJobi, CoCaLo, and Kids Line to Kids Brands' success and viability, the fact that illegal activities were occurring at three of four subsidiaries, the fact that management-level employees were directly participating in the U.S. Customs violations, and the fact that the Individual Defendants were at the very least aware of the re-labeling of country of origin labels at LaJobi, the allegations at least raise a strong inference of corporate scienter as to Kid Brands that is at least as plausible as any opposing inference.

(Pl. Opp'n. 35). As in the Court's previous Opinion, based on the limited indicia of scienter addressed above, collective scienter is not sufficiently pled in the SAC. For example, Plaintiff does not provide factual allegations regarding the exact nature of the misconduct at any of the Kid Brands' subsidiaries, including LaJobi, during either portion of the Class Period. Neither does the SAC indicate what, if any, internal mechanisms were in place to monitor compliance with applicable laws nor the ways in which they may have been disregarded. Finally, the SAC is devoid of factual allegations which would indicate the extent of notice, if any, of the purported wrongdoing. Accordingly, as with the First Amended Complaint, "[t]here is no suggestion . . . that the [C]ompany and its subsidiaries were thoroughgoingly non-compliant with [applicable] laws and regulations but nevertheless presented to the public that they were in fact

28

compliant in all respects."  (CM/ECF No. 44, 38).     Accordingly, the Court cannot make a strong inference based on the facts pled that any executives or members of the Board had knowledge of or were reckless with regard to the purported wrongdoing at the Kid Brands' subsidiaries and, accordingly, finds imposition of the collective scienter doctrine inappropriate here.  Therefore, as the SAC fails to satisfy the heightened pleading requirements for individual or collective scienter, the Court dismisses Count I with prejudice.

## B. Section 20(a) Control Person Liability

Individuals who exercise control over a "controlled person," including a corporation, that has committed a violation of Section 10(b) may be held liable under Section 20(a) of the Securities Exchange Act.  15 U.S.C. § 78t(a); Avaya, 564 F.3d at 252.  However, as explained in the previous Opinion, the imposition of liability under Section 20(a) is predicated upon an underlying violation of Section 10(b).  In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 153 (3d Cir. 2004).  Indeed, as this Court previously explained, "if no controlled person is liable, there can be no controlling person liability."  (CM/ECF No. 44, 14) (quoting Alpharma, 372 F.3d at 153).  As the Court already determined that the SAC does not state a claim for a violation of Section 10(b), there can be no control person liability as to the Individual Defendants here.

## IV. CONCLUSION

For the reasons stated above, taken as a whole, the allegations set forth in the SAC do not contain the overall factual support necessary to satisfy the PSLRA's

heightened pleading requirement that a plaintiff allege a strong inference of scienter.
Therefore, the Court dismisses with prejudice Count I for violation of §10(b) of the
Securities Exchange Act and, as a result, dismisses Count II for control person liability
under §20(a).

An appropriate Order accompanies this Opinion.

Dated: October 12, 2012

Jose L. Linares
United States District Judge

30